342 F.Supp. 439 (1972)
COMMITTEE FOR PUBLIC EDUCATION AND RELIGIOUS LIBERTY et al., Plaintiffs,
v.
Arthur LEVITT, as Comptroller of the State of New York, and Ewald B. Nyquist, as Commissioner of Education of the State of New York, Defendants,
and
Cathedral Academy, Albany, New York, et al., Intervenor-Defendants.
No. 70 Civ. 3251.
United States District Court, S. D. New York.
April 27, 1972.
Leo Pfeffer, New York City, for plaintiffs.
Louis J. Lefkowitz, Atty. Gen. of N. Y., Albany, for defendants Levitt and Nyquist; Ruth Kessler Toch, Sol. Gen., and Jean M. Coon, Asst. Sol. Gen., of counsel.
Davis, Polk & Wardwell, New York City, for intervenor-defendants Cathedral Academy, St. Ambrose School, and Bishop Loughlin Memorial High School; Porter R. Chandler, Richard E. Nolan and James W. B. Benkard, New York City, of counsel.
Julius Berman and Marcel Weber, New York City, for intervenor-defendants Bais Yaakov Academy for Girls and Yeshivah Rambam.
LASKER, District Judge.
We are called upon to determine the constitutionality of Chapter 138 of New York State's laws of 1970, which appropriates $28,000,000 to be paid to nonpublic schools for expenses incurred in complying with requirements of state *440 law of which the principal are the testing of pupils and maintenance of attendance and health records.[1]
In 1970 there were 850,000 students in nonpublic schools in New York. Chapter 138 includes the following legislative finding:
"That the state has a primary responsibility to assure that its precious resource, the young people of the state, receive educational opportunity which will prepare them for the challenges of American life in the last decades of the twentieth century.
"That the state has the duty and authority to provide the means to assure through examination that inspection, and through other activities, that all of the young people of the state, regardless of the school in which they are enrolled, are attending upon instruction as required by the education law and are maintaining levels of achievement which will adequately prepare them, within their capabilities.
"That these fundamental objectives are accomplished with respect to public schools in part through the provision by the state of aid to local school districts to meet such costs."
Plaintiffs are taxpayers of New York and an unincorporated association whose members are New York residents whose objectives include opposition to use of public funds for the support of sectarian or religious schools. Defendants are the Commissioner of Education, who administers the statute, and the State Comptroller, who makes payment of the appropriated funds. Intervenors are Catholic and Jewish parochial schools who are beneficiaries of the Act.
The record contains defendants' and intervenors' answers to plaintiffs' interrogatories. No factual disputes exist.
Plaintiffs sue to enjoin the enforcement of the statute. Defendants move for judgment, claiming that the statute violates neither the federal nor the state constitution, and to dismiss the complaint on the ground that it raises a threshold question of violation of the constitution of the State of New York.

I.
The statute, which became effective July 1, 1970, directs the Commissioner of Education to apportion annually to nonpublic schools the sum of $27 for each pupil in average daily attendance in the first six grades and $45 for those in grades seven through twelve. The express purpose of the expenditure, as indicated above, is to compensate the schools for services "mandated" by state law or regulation of the Commissioner. These services include administration of compulsory attendance laws, Regents' examinations, and pupil evaluation program tests, as well as preparation of various reports intended to assure that minimum state educational standards are met. The services rendered are required of public and nonpublic schools alike.
The Act is construed and applied by the defendants to include as permissible beneficiaries schools which (a) impose religious restrictions on admissions; (b) require attendance of pupils at religious activities; (c) require obedience by students to the doctrines and dogmas of a particular faith; (d) require pupils to attend instruction in the theology or doctrine of a particular faith; (e) are an integral part of the religious mission of the church sponsoring it; (f) have *441 as a substantial purpose the inculcation of religious values; (g) impose religious restrictions on faculty appointments; and (h) impose religious restrictions on what or how the faculty may teach. (Answer to Interrogatory 7).[2]
The beneficiary schools are required neither to account for nor return to the state any amounts received by them in excess of their actual expenditures for "mandated services." (Answers to Interrogatories 4, 7 and 11). This, of course, leaves a school free to expend any excess for whatever purpose it wishes, including religious or sectarian objectives.
Since the statute is predicatedand its constitutionality allegedly justified on the ground that it merely reimburses the nonpublic schools for expenses of state-mandated services, post-enactment studies have been conducted comparing the actual cost to the schools of performing services with the amounts allocated to them by the state. The conclusions to be drawn from such reports (Exhibit D to Defendant Nyquist's Answers to Plaintiffs' Interrogatories) are cloudy. If such items as "teacher examinations" and "entrance examinations" are included in the list of "mandated services," it appears that the schools' expenses are at least as great as the amounts they receive from the state. But if those items are excluded, the amounts received from the state are substantially greater than the schools' expenses. Doubt as to which standard is properly applied is occasioned by material submitted by the Commissioner to the Board of Regents at its request which states (Exhibit G to Defendant Nyquist's Answers to Interrogatories, at p. ES 1.9):
". . . only the Regents Scholarship and January and June Regents Examinations might be regarded as specifically mandated. Inclusion of such costs only would reduce the examination figure [of $68,853] by $66,629." (Emphasis in original).
While our decision as to the constitutionality of the statute does not turn on the factual question so presented, we mention it to illustrate the lack of certainty as to the purposes for which the moneys received are actually used, or, indeed, whether they can be regarded as specifically "mandated."
Plaintiffs contend that on its face, and as applied, the statute violates the establishment clause of the First Amendment to the federal constitution, as well as Article 11, section 3, of the New York constitution, because its purpose and primary effect is to advance religion and it gives rise to excessive governmental involvement and entanglement in religion.[3]
Defendants and intervenors argue that the statute is constitutionally justified since payments are made solely as reimbursement for the expenses of furnishing secular services mandated by the state. They contend that the Act constitutes neither sponsorship, financial support, nor active involvement in religious activity by the state and does not cause excessive entanglement of church and state. They also claim that, aside from the merits, the complaint should *442 be dismissed for "lack of jurisdiction"[4] because the complaint raises a threshold question under the constitution of New York. This contention was exhaustively treated and rejected by the convening judge (Committee for Public Education and Religious Liberty, et al., v. Rockefeller, et al., 322 F.Supp. 678, 687 (S.D.N.Y.1971)). We agree with his view that neither abstention nor dismissal for the reason suggested is appropriate here. The federal and state issues are of equal importance. The statute is unambiguous on its face, and under the rule of Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), the court should "proceed to decide the federal constitutional claim." Furthermore, abstention is particularly unsuitable in this case because, as indicated in the convening judge's opinion (322 F.Supp. at 688), plaintiffs have no standing under New York law to litigate the state constitutional question in the New York courts. We are unimpressed by the proposal in the state's brief that we should abstain because "there is no assurance that that Court [i. e., Court of Appeals of New York] would not now reverse the position that it took in earlier cases . . ." in the light of the holding in Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1967), that a federal taxpayer has standing to sue for constitutional violations. Nothing in the New York Court of Appeals' decisions since Flast encourages or supports the state's argument on this point.

II.
We come to the federal constitutional question. We are guided so clearly by the decision of the Supreme Court last term in Lemon v. Kurtzman and Earley v. DiCenso, 403 U.S. 602, 91 S. Ct. 2105, 29 L.Ed.2d 745 (1971), that we need not review at length earlier cases which articulated constitutional limits on governmental assistance to church-supported schools. The boundaries of permissible government action in the field were set by Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), and Board of Education v. Allen, 392 U.S. 236, 88 S. Ct. 1923, 20 L.Ed.2d 1060 (1968). In Everson, the Court upheld a New Jersey statute which reimbursed parents for bus fares of children attending parochial schools. However, the Everson Court cautioned that its decision carried to "the verge" of what Chief Justice Burger, in Lemon, described as the "forbidden territory under the Religion Clauses." In Allen, the Court found that a New York law under which the state loaned school books to students at parochial schools passed constitutional muster. Neither case involved a statute which, as here, grants direct subsidies to parochial schools; and in Lemon the Court struck down two such plans.
The Lemon-Earley decision dealt with Pennsylvania and Rhode Island statutes which, as here, provided for cash payments intended to assist parochial schools in the acknowledgedly grave financial crisis which faces them. The Rhode Island statute, resting on a legislative finding that the quality of education available in nonpublic schools was jeopardized by rising salaries needed to attract teachers, authorized state officials to supplement the salaries of teachers of secular subjects in nonpublic elementary schools by direct limited payment to the teacher. The teacher was bound to teach only subjects and use only teaching materials offered in public schools, and not to teach any course in religion. Eligible schools were required to submit to the state financial data necessary to determine the propriety *443 of payments under the Act. The Pennsylvania statute, also based on a legislative finding of rapidly rising costs in the state's nonpublic schools, authorized the Superintendent of Public Instruction to "purchase" "secular educational services" from nonpublic schools. The purchase was consummated by state reimbursement to nonpublic schools of actual expenses for teachers' salaries, text books and materials. To secure reimbursement, a school was required to follow specified accounting procedures subject to state audit. Reimbursement was limited to such secular courses as mathematics, foreign languages, physical science, and physical education, and prohibited courses that contained "any subject matter expressing religious teaching, or the morals or forms of worship of any sect."
From this analysis it is apparent that the New York statute before us more closely resembles the Pennsylvania than the Rhode Island statute, and our decision is guided by the Supreme Court's observations as to the former. Indeed, the sole differences of substance which exist between the Pennsylvania statute and New York's mandated services law are that reimbursement was permitted under the Pennsylvania law principally for teaching, whereas here it is allowed primarily for testing; and under the Pennsylvania statute a school was required, subject to audit, to account to the state, while here the school is not. We find these distinctions insufficient to avoid the rule of Lemon-Earley, concluding, as did the Lemon Court, "that the cumulative impact of the entire relationship arising under the statute[s] . . . involves excessive entanglement between government and religion."
The Lemon Court's finding of excessive entanglement was based on an examination of the "character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." Lemon, supra, 403 U.S. at 615, 91 S.Ct. at 2112.
In the case at hand there is no question as to the character and purposes of the institutions which are benefited. No dispute exists as to the close association of the schools to the religious institutions of various faiths which support them. Indeed, the record establishes that payments are made to schools which, for example, impose religious restrictions on admissions, require attendance of pupils at religious activities, and are an integral part of the religious mission of the supporting church.
The nature of the aid provided here is precisely the same as the state aid provided by Pennsylvania in Lemon that is, financial assistance paid directly to the church-related school. Even before its holding in Lemon that such payments violated the establishment clause, the Court had cautioned in Walz v. Tax Commission, 397 U.S. 664, 675, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970):
"Obviously a direct money subsidy would be a relationship pregnant with involvement and, as with most governmental grant programs, could encompass sustained and detailed administrative relationships for enforcement of statutory or administrative standards."
The defendants here contend that the rationale of Lemon-Earley and the quoted Walz passage are inapplicable to the New York statute, which does not require, either on its face or as administered, any "detailed administrative relationship for enforcement" of the statute. It is said that, since the New York law simply does not require beneficiaries to report on their use of the funds, the vice foreseen in Walz and found fatal in Lemon does not exist here.
The argument is unpersuasive. As the Lemon Court commented:
"The history of government grants of a continuing cash subsidy indicates that such programs have almost always been accompanied by varying measures of control and surveillance." (403 U.S. at 621, 91 S.Ct. at 2115).
*444 We think this lesson of history is applicable here. Indeed, the gentle inquiry of the Board of Regents which caused studies to be made to determine whether the costs to the nonpublic schools for mandated services are actually as great as the amounts they receive from the state is a sort of inching in that direction. It is not unreasonable to assume that, in this day of tight budgets and taxpayer uneasiness, the dictates of sound administration, or political pressures, will likely give birth to a system of surveillance and controls intended to assure that, at the least, the state is not paying for more than it is receiving. Indeed, section 8 of the statute itself states: "Nothing contained in this act shall be construed to authorize the making of any payment under this act for religious worship or instruction." It is difficult to see how the Board of Regents or the Commissioner can in good faith implement the language of section 8 without sooner or later instituting the type of surveillance and controls which the Lemon Court found to foster excessive entanglement.
Assuming, however, that such a prognosis is unfounded, the alternative leaves the statute even more vulnerable. For if no system of audit or control is to be instituted, this will leave the schools free, as they apparently are now, to keep their shares of the apportioned moneys regardless of whether their expenses are as great as their receipts, and to use any excess for the general purposes of their religious missions. The dilemma we have outlined is insoluble. Either the statute falls because a system of surveillance and control would create excessive entanglement, or, without such a system, the schools would be free to use funds for religious purposes. The constitution is breached whichever route is chosen.
Defendants argue that the strictures of Lemon and Walz against cash payments do not apply here because reimbursement is being made for services which are "secular, neutral, or nonideological" (Lemon, at 616, 91 S.Ct. 2105) analogous to the payments which were approved in Everson and Allen. The analogy, however, is inapposite. Bus transportation, school lunches, public health services, and secular text books (for which payment was approved in Everson, Allen and other cases) are of a character entirely different from services rendered by teachers in administering tests not only developed by the state, but those developed by the schools or the teachers. By far the greatest portion of the funds appropriated under Chapter 138 is paid for the services of teachers in testing students, and testing is an integral part of the teaching process. As the Court commented in Lemon, "teachers have a substantially different ideological character from books." It is this fundamental distinction which makes the limited rules of Everson and Allen inapplicable. Nor does the fact that the reimbursement by New York is for "mandated services" rescue the statute. It is true, of course, that administration of tests, recording attendance of students, and compiling health records are required by the state, but so is teaching required by the state if a private school, parochial or otherwise, is to be certified as an adequate substitute for public school. It would be fanciful to suggest, however, that the state would be free to reimburse the schools for ordinary teaching expenses on the theory that the state "mandates" such services.
Even if all these observations were not true, the statute would nevertheless be constitutionally flawed. As the Lemon-Earley Court stated:
"A broader base of entanglement of yet a different character is presented by the divisive political potential of these state programs." (at 622, 91 S.Ct. at 2115).
The Court held there that in a community with a large number of pupils served by church-related schools (surely true in the present case) it is reasonable to assume *445 that state assistance will result in the aggravation of divisive political activity on the part of supporters and opponents of the annual appropriation legislation. The Court concluded (at 622, 91 S.Ct. at 2116) that ". . . political division along religious lines was one of the principal evils against which the First Amendment was intended to protect." Measured by this standard, the New York statute suffers precisely the same constitutional defects as both the Pennsylvania and Rhode Island statutes in Lemon-Earley.
While we thus conclude that Chapter 138 violates the establishment clause of the First Amendment, it is proper for us to note our sympathetic awareness of the serious financial problems directly facing the parochial schools and, indirectly, the public. We recognize and appreciate the contribution which private schools have made financially and in providing that variety of approach to education which enriches community life. But the First Amendment, which has for two centuries assured the individual's right to worship as he chooses, protected the church from the impositions of the state, and immunized the national community against the ills of religious-political divisiveness, must be our guiding star.
A permanent injunction against the enforcement of the statute will be granted. The defendants' motions are denied.
Submit order on notice.
PALMIERI, District Judge (dissenting).
I respectfully dissent. The statute under review is, in my opinion, a legitimate exercise of the duty of the state to assure that all children, regardless of the school they attend, receive adequate and full-time instructions in the secular subjects required by standards fixed by law. The private and parochial schools of New York State have been part of a single unitary system of education for many years and they have been under the jurisdiction of the Board of Regents since 1784.
I deplore the incalculable and irreversible harm which will be done by this decision. The statute invalidated by the majority decision is a reimbursement statute. It provides only a fractional reimbursement for the cost of record keeping and testing by non-public schools and required of them by state law and regulation. The record is uncontested that the sums appropriated by the legislature to assure attendance and adequate examination procedures are much less than the schools expend for such purposes. This provides adequate assurance that government funds are not available for examination functions peculiar to religious institutions. To suggest otherwise is to let prejudice against education under religious auspices prevail over wise analysis.[1] It is a tragic symptom of our time that so simple an objective of a state legislature, simply implemented, should become a focus of objection by those who appear to share deep antipathies and fears with regard to secular education under religious auspices. One is impelled to ask whether the eyes of those who have such fears may be blinded by tragic conflicts now lost in history and which anteceded that of our own Constitution.
I am constrained to decline to participate in destroying this legislative act by judicial action. A vast majority of the legislature of the State of New York, and the Governor of that state, have determined that this partial reimbursement statute is a legitimate area of state concern and action, free of constitutional restraint. This court today undertakes the serious responsibility of overturning legislative findings of reasonableness. It takes this step notwithstanding the Supreme Court's statement in Tilton v. *446 Richardson, 403 U.S. 672, 678, 91 S.Ct. 2091, 2095, 29 L.Ed.2d 790 (1971), that
"candor compels the acknowledgment that we can only dimly perceive the boundaries of permissible government activity in this sensitive area of constitutional adjudication"
and that "[j]udicial caveats against entanglement" are a "blurred, indistinct and variable barrier." Lemon v. Kurtzman, 403 U.S. 602, 614, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). It has long been held that separation of church and state cannot mean the absence of all contact. Beginning with state police and fire protection for churches, the theory of allowable contact has expanded with the reimbursement procedures in Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), the allocation procedure for free books in Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), and Cochran v. Louisiana State Board of Education, 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913 (1930), and the administrative relationships inherent in the tax exemption in Walz v. Tax Commission of the City of New York, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).[2] If, as the Supreme Court pointed out in Allen, supra, 392 U.S. at 247, 88 S.Ct. at 1928, a state "has a proper interest in the manner in which those [private] schools perform their secular educational function" then that interest is appropriately implemented here. I can perceive nothing in the decision of the Supreme Court in Lemon v. Kurtzman and Earley v. DiCenso, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), which requires the conclusions reached by the majority. There is neither entanglement nor involvement between church and state, let alone "an excessive government entanglement with religion" condemned in that case, supra at 613, 91 S.Ct. at 2111, and in Walz, supra, 397 U.S. at 674, 90 S.Ct. 1409. Indeed, reimbursement for attendance and examination services duly performed by operation of law is clearly within the guidelines established by the Supreme Court in Lemon-Earley where it said (403 U.S. at page 616, 91 S.Ct. at page 2113) that its "decisions from Everson [supra] to Allen [supra] have permitted the States to provide church-related schools with secular, neutral, or nonideological services, facilities, or materials."
Accepting, as I believe we must, the basic premise that no perfect or absolute separation between religion and government is really possible, see Walz v. Tax Commission of the City of New York, supra, 397 U.S. at 670, 90 S.Ct. 1409, I agree patly with the views of Judge Oakes very recently expressed in the case of Americans United for Separation of Church and State v. Oakey (D.Vt., 1972) 339 F.Supp. 545, that we should "search for ways within the American system of public education that will preserve, indeed promote, the diversity of individual beliefreligious, political and socialthat, along with our Bill of Rights, distinguishes us so plainly from certain uniform, unified and uni-governed societies elsewhere in the world."
I would hold that this statute neither on its face nor as applied by the defendants is unconstitutional; and I would dismiss the complaint on the merits.
NOTES
[1] The appropriation is to be paid to nonpublic schools "for expenses of services for examination and inspection in connection with administration, grading and the compiling and reporting of the results of tests and examinations, maintenance of records of pupil enrollment and reporting thereon, maintenance of pupil health records, recording of personnel qualifications and characteristics and the preparation and submission to the state of various other reports as provided for or required by law or regulation." (Chap. 138 of the Laws of 1970).
[2] It should be pointed out that intervenors Cathedral Academy, St. Ambrose School and Bishop Loughlin Memorial High School do not impose religious restrictions on admissions or require attendance of pupils at religious activities or obedience by students to the doctrine of a particular faith; that the schools contribute to the religious mission of the sponsoring church, but they do not impose religious restrictions on faculty appointments and they place restrictions on teaching only to the extent that it not be contrary to the tenets of the sponsoring church. (Intervenors' Answers to Interrogatory 3).
[3] Plaintiffs also allege that the statute constitutes compulsory taxation in aid of religion in violation of the free exercise clause of the First Amendment. In view of the rationale by which we dispose of the case, it is unnecessary to consider this argument.
[4] Defendants state the position in their brief as follows:

"The complaint should be dismissed on the ground that the Court lacks jurisdiction over the subject matter of the action in that the complaint raises a threshold question of the constitutionality of the statute under the provisions of the constitution of the State of New York."
We assume that defendants wish us to apply the doctrine of abstention, since it is clear that the Court has jurisdiction of the First Amendment issue.
[1] This comment and those immediately following are not intended to reflect upon my esteemed colleagues but are directed to those who appear to be making a career of this type of destructive litigation.
[2] This language is borrowed substantially from P.O.A.U. v. Essex, 28 Ohio St.2d 79, 275 N.E. 2d 603 (1971).