# NEW YORK *v.* CATHEDRAL ACADEMY

No. 76–616.  Argued October 3, 1977—Decided December 6, 1977

*Jean M. Coon,* Assistant Solicitor General of New York, argued the cause for appellant. With her on the brief were *Louis J. Lefkowitz,* Attorney General, *Ruth Kessler Toch,* Solicitor General, and *Kenneth Connolly,* Assistant Attorney General.

*Richard E. Nolan* argued the cause for appellee. With him on the brief was *Thomas J. Aquilino, Jr.*

MR. JUSTICE STEWART delivered the opinion of the Court.

In April of 1972 a three-judge United States District Court for the Southern District of New York declared unconstitutional New York's Mandated Services Act, 1970 N. Y. Laws,

ch. 138, which authorized fixed payments to nonpublic schools as reimbursement for the cost of certain recordkeeping and testing services required by state law. *Committee for Public Education & Religious Liberty* v. *Levitt,* 342 F. Supp. 439. The court's order permanently enjoined any payments under the Act, including reimbursement for expenses that schools had already incurred in the last half of the 1971–1972 school year.[1] This Court subsequently affirmed that judgment. *Levitt* v. *Committee for Public Education,* 413 U. S. 472.

In June 1972 the New York State Legislature responded to the District Court's order by enacting ch. 996 of the 1972 N. Y. Laws. The Act "recognize[d] a moral obligation to provide a remedy whereby . . . schools may recover the complete amount of expenses incurred by them prior to June thirteenth[, 1972,] in reliance on" the invalidated ch. 138, and conferred jurisdiction on the New York Court of Claims "to hear, audit and determine" the claims of nonprofit private schools for such expenses. Thus the Act explicitly authorized what the District Court's injunction had prohibited: reimbursement to sectarian schools for their expenses of performing state-mandated services through the 1971–1972 academic year.

The appellee, Cathedral Academy, sued under ch. 996 in the Court of Claims, and the State defended on the ground that the Act was unconstitutional.[2] The Court of Claims agreed that ch. 996 violated the First and Fourteenth Amendments, and dismissed Cathedral Academy's suit. 77 Misc. 2d 977,

---

[1] The order permanently enjoined "all persons acting for or on behalf of the State of New York . . . from making any payments or disbursements out of State funds pursuant to the provisions of Chapter 138 of the New York Laws of 1970, in payment for or reimbursement of any moneys heretofore or hereafter expended by nonpublic elementary and secondary schools." No. 70 Civ. 3251 (June 1, 1972).

[2] At oral argument the Assistant Solicitor General of New York said that the State of New York frequently defends against claims for payment on the ground that the enabling Act authorizing suit in the Court of Claims is unconstitutional.

354 N. Y. S. 2d 370.   The Appellate Division affirmed, 47 App.
Div. 2d 390, 366 N. Y. S. 2d 900, but the New York Court of
Appeals, adopting a dissenting opinion in the Appellate Divi-
sion, reversed and remanded the case to the Court of Claims
for determination of the amount of the Academy's claim.[3]   39
N. Y. 2d 1021, 355 N. E. 2d 300.   An appeal was taken to this
Court, and we postponed further consideration of the question
of our appellate jurisdiction until the hearing on the merits.
429 U. S. 1089.   We conclude that the Court of Appeals' deci-
sion finally determined the federal constitutional issue and is
ripe for appellate review in this Court under 28 U. S. C.
§ 1257 (2).[4]

## I

The state courts and the parties have all considered this
case to be controlled by the principles established in *Lemon* v.
*Kurtzman,* 411 U. S. 192 (*Lemon II*), which concerned the
permissible scope of a Federal District Court's injunction for-
bidding payments to sectarian schools under an unconstitu-
tional state statute.   Previously in that same litigation we had

---

[3] The dissenting judges in the Court of Appeals voted to affirm on the
majority opinion in the Appellate Division.   39 N. Y. 2d, at 1022, 355
N. E. 2d 300.   We shall refer to the dissenting opinion of Justice
Herlihy in the Appellate Division, 47 App. Div. 2d 396, 366 N. Y. S. 2d
905, adopted by the majority in the Court of Appeals, as the opinion of
the Court of Appeals.

[4] It is clear that the New York Court of Appeals has finally determined
that under the principles established in *Lemon* v. *Kurtzman,* 411 U. S. 192
(*Lemon II*), the Academy and other schools in similar positions are
entitled to prove claims for reimbursement under ch. 996.   While the Court
of Appeals remanded for an audit in the Court of Claims to determine the
amount of the Academy's claim, and while the precise scope of the audit
is unclear, we conclude for the reasons stated in Part II of the text below
that no possible developments on remand could sufficiently minimize the
risk of future constitutional harm to justify relief even under *Lemon II*'s
balancing of constitutional and equitable considerations.   Since further
proceedings cannot remove or otherwise affect this threshold federal issue,
the Court of Appeals' decision is final for purposes of review in this Court.
See *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469, 478–480.

declared unconstitutional a Pennsylvania statute authorizing payments to sectarian schools for specific secular services provided under contract with the State, and remanded the case to the trial court for entry of an appropriate decree. *Lemon* v. *Kurtzman,* 403 U. S. 602 (*Lemon I*). On remand, the District Court enjoined payments under the statute for any services performed after the date of this Court's decision, but did not prohibit payments for services provided before that date. 348 F. Supp. 300, 301 n. 1 (ED Pa.). In *Lemon II* this Court affirmed the trial court's denial of retroactive injunctive relief against the State, noting that "in constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable." 411 U. S., at 200 (footnote omitted).

The primary constitutional evil that the *Lemon II* injunction was intended to rectify was the excessive governmental entanglement inherent in Pennsylvania's elaborate procedures for ensuring that "educational services to be reimbursed by the State were kept free of religious influences." *Id.,* at 202. The payments themselves were assumed to be constitutionally permissible, since they were not to be directly supportive of any sectarian activities. Because the State's supervision had long since been completed with respect to expenses already incurred, the proposed payments were held to pose no continued threat of excessive entanglement. Two other problems having "constitutional overtones"—the impact of a final audit and the effect of funding even the entirely nonreligious activities of a sectarian school—threatened minimal harm "only once under special circumstances that will not recur." *Ibid.*

In this context this Court held that the unique flexibility of equity permitted the trial court to weigh the "remote possibility of constitutional harm from allowing the State to keep its bargain" against the substantial reliance of the schools that had incurred expenses at the express invitation of the State. The District Court, "applying familiar equitable principles," could properly decline to enter an injunction that

would do little if anything to advance constitutional interests while working considerable hardship on the schools. Cf. *Hecht Co.* v. *Bowles,* 321 U. S. 321.

In the present case, however, the District Court did not limit its decree as the court had done in *Lemon II,* but instead expressly enjoined payments for amounts *"heretofore* or hereafter expended."  See n. 1, *supra* (emphasis supplied).  The state legislature thus took action inconsistent with the court's order when it passed ch. 996 upon its own determination that, because schools like the Academy had relied to their detriment on the State's promise of payment under ch. 138, the equities of the case demanded retroactive reimbursement.  To approve the enactment of ch. 996 would thus expand the reasoning of *Lemon II* to hold that a state legislature may effectively modify a federal court's injunction whenever a balancing of constitutional equities might conceivably have justified the court's granting similar relief in the first place.  But cf. *Wright* v. *Council of City of Emporia,* 407 U. S. 451, 467. This rule would mean that every such unconstitutional statute, like every dog, gets one bite, if anyone has relied on the statute to his detriment.  Nothing in *Lemon II,* whose concern was to "examine the District Court's evaluation of the proper means of implementing an equitable decree," 411 U. S., at 200, suggests such a broad general principle.

But whether ch. 996 is viewed as an attempt at legislative equity or simply as a law authorizing payments from public funds to sectarian schools, the dispositive question is whether the payments it authorizes offend the First and Fourteenth Amendments.

## II

The law at issue here, ch. 996, authorizes reimbursement for expenses incurred by the schools during the specified time period

"in rendering services for examination and inspection in connection with administration, grading and the com-

piling and reporting of the results of tests and examinations, maintenance of records of pupil enrollment and reporting thereon, maintenance of pupil health records, recording of personnel qualifications and characteristics and the preparation and submission to the state of various other reports required by law or regulation."

It expressly states that the basis for the legislation is the State's representation in the now invalidated ch. 138 that such expenses would be reimbursed. Thus, while ch. 996 provides for only one payment rather than many, and changes the method of administering the payments, nothing on the face of the statute indicates that payments under ch. 996 would differ in any substantial way from those authorized under ch. 138.

Unlike the constitutional defect in the state law before us in *Lemon I,* the constitutional invalidity of ch. 138 lay in the payment itself, rather than in the process of its administration. The New York statute was held to be constitutionally invalid because "the aid that [would] be devoted to secular functions [was] not identifiable and separable from aid to sectarian activities." *Levitt* v. *Committee for Public Education,* 413 U. S., at 480. This was so both because there was no assurance that the lump-sum payments reflected actual expenditures for mandated services, and because there was an impermissible risk of religious indoctrination inherent in some of the required services themselves. We noted in particular the "substantial risk that . . . examinations, prepared by teachers under the authority of religious institutions, will be drafted with an eye, unconsciously or otherwise, to inculcate students in the religious precepts of the sponsoring church." *Ibid.* Thus it can hardly be doubted that if ch. 996 authorizes payments for the identical services that were to be reimbursed under ch. 138, it is for the identical reasons invalid.

The Academy argues, however, that the Court of Appeals has construed the statute to require a detailed audit in the Court of Claims to "establish whether or not the amounts

claimed for mandated services constitute a furtherance of the religious purposes of the claimant." 47 App. Div. 2d, at 397, 366 N. Y. S. 2d, at 906. This language is said to require the Court of Claims to review in detail all expenditures for which reimbursement is claimed, including all teacher-prepared tests, in order to assure that state funds are not given for sectarian activities. We find nothing in the opinions of the state courts to indicate that such an audit is authorized under ch. 996.[5]

But even if such an audit were contemplated, we agree with the appellant that this sort of detailed inquiry into the subtle implications of in-class examinations and other teaching activities would itself constitute a significant encroachment on the protections of the First and Fourteenth Amendments. In order to prove their claims for reimbursement, sectarian schools would be placed in the position of trying to disprove

---

[5] The Court of Claims dismissed the Academy's claim in part because it found no "enforceable standards or guidelines" in ch. 996 "which would enable this Court to separate and apportion the single per-pupil allotment among the various allowed purposes." 77 Misc. 2d, at 985, 354 N. Y. S. 2d, at 378. Thus it did not believe that ch. 996 authorized it to reimburse schools only for clearly secular expenses, such as the cost of maintaining attendance and medical records, while refusing payments for other "allowed purposes" such as in-class examinations that this Court had held impermissible. The opinion of the Court of Appeals does not contradict this interpretation.

While the language quoted in the text is somewhat ambiguous, it appears that the Court of Appeals interpreted ch. 996 to require an audit similar to the post-audit contemplated in *Lemon II,* in which "the burden will be upon the claimant to prove that the items of its claims are in fact solely for mandated services . . . ." 47 App. Div. 2d, at 400, 366 N. Y. S. 2d, at 908. As was made clear in *Levitt* v. *Committee for Public Education,* 413 U. S. 472, however, limiting reimbursement to mandated services would not fully address the constitutional objections to ch. 138, since it would provide no assurance against reimbursement for sectarian mandated services. Thus, a post-audit like the one contemplated in *Lemon II,* which the Court characterized as a "ministerial 'cleanup' function," 411 U. S., at 202, would not in this case exclude payments that impermissibly aided religious purposes.

any religious content in various classroom materials. In order to fulfill its duty to resist any possibly unconstitutional payment, see n. 2, *supra*, the State as defendant would have to undertake a search for religious meaning in every classroom examination offered in support of a claim. And to decide the case, the Court of Claims would be cast in the role of arbiter of the essentially religious dispute.

The prospect of church and state litigating in court about what does or does not have religious meaning touches the very core of the constitutional guarantee against religious establishment, and it cannot be dismissed by saying it will happen only once. Cf. *Presbyterian Church* v. *Blue Hull Mem. Presb. Church*, 393 U. S. 440. When it is considered that ch. 996 contemplates claims by approximately 2,000 schools in amounts totaling over \$11 million, the constitutional violation is clear.[6]

For the reasons stated, we hold that ch. 996 is unconstitutional because it will of necessity either have the primary effect of aiding religion, see *Levitt* v. *Committee for Public Education, supra,* or will result in excessive state involvement in religious affairs. See *Lemon I,* 403 U. S. 602.

### III

But even assuming, as the New York Court of Appeals did, that under *Lemon II* a degree of constitutional infirmity may be tolerated in a state law if other equitable considerations predominate, we cannot agree that the equities support what the state legislature has done in ch. 996.

In *Lemon II* the constitutional vice of excessive entanglement was an accomplished fact that could not be undone by enjoining payments for expenses previously incurred. And

---

[6] The parties have considered the Academy's claim a test of the constitutionality of ch. 996. Claims filed by other schools have been stayed in the Court of Claims pending the resolution of this case.

precisely because past practices had clearly identified permissibly reimbursable secular expenses, an additional single payment was held not to threaten the additional constitutional harm of state support to religious activities. By contrast, ch. 996 amounts to a new and independently significant infringement of the First and Fourteenth Amendments.

Moreover the Academy's detrimental reliance on the promise of ch. 138 was materially different from the reliance of the schools in *Lemon II.* Unlike the Pennsylvania schools, the Academy was required by pre-existing state law to perform the services reimbursed under ch. 138. In essence, the Academy could have relied on ch. 138 only by spending its own funds for nonmandated, and perhaps sectarian, activities that it might not otherwise have been able to afford. While this Court has never held that freeing private funds for sectarian uses invalidates otherwise secular aid to religious institutions, see *Roemer* v. *Maryland Public Works Board,* 426 U. S. 736, 747, and n. 14 (plurality opinion), it is quite another matter to accord positive weight to such a reliance interest in the balance against a measurable constitutional violation.

Accordingly, the judgment of the New York Court of Appeals is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST believe that this case is controlled by the principles established in *Lemon* v. *Kurtzman,* 411 U. S. 192 (1973), and would therefore affirm the judgment of the Court of Appeals of New York.

MR. JUSTICE WHITE, dissenting.

Because the Court continues to misconstrue the First Amendment in a manner that discriminates against religion and is contrary to the fundamental educational needs of the

country, I dissent here as I have in *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971); *Committee for Public Education* v. *Nyquist,* 413 U. S. 756 (1973); *Levitt* v. *Committee for Public Education,* 413 U. S. 472 (1973); *Meek* v. *Pittenger,* 421 U. S. 349 (1975); and *Wolman* v. *Walter,* 433 U. S. 229 (1977).