Wood, Chief Judge.
St. Augustine School, along with Joseph and Amy Forro, sued Wisconsin's Superintendent of Public Instruction and Friess Lake School District for refusing to provide school transportation (or equivalent cash benefits) to the Forros' children. The school and family assert that the state denied them this benefit in violation of the Establishment and Free Exercise Clauses of the First Amendment.
The district court granted summary judgment for the defendants, and we now affirm. Contrary to the plaintiffs' assertions, the record does not establish that the Superintendent or the school district furnished or withheld public benefits on the basis of non-neutral religious criteria. Nor does the evidence support the claim that public officials impermissibly determined the school's affiliation on the basis of theology, ecclesiology, or ritual. Instead, it shows that public officials applied a secular statute that limits benefits to a single school affiliated with any sponsoring group-and, when St. Augustine declared itself to be Catholic, they took the school at its word.[1]
*594 I
Wisconsin law requires school districts to bus private-school students,[2] WIS. STAT. § 121.54, but that obligation extends only to one private school "affiliated with the same religious denomination" within each geographic attendance area, WIS. STAT. § 121.51. In an effort to avoid an unconstitutional interpretation of this limitation, the Wisconsin Supreme Court has construed section 121.51 to reach any two private schools "affiliated or operated by a single sponsoring group , whether ... secular or religious." State ex rel. Vanko v. Kahl , 52 Wis.2d 206, 215, 188 N.W.2d 460 (1971) (emphasis added). According to that court, the statute's reference to denominational affiliation is not meant to introduce a religious criterion, but rather to establish that the test of affiliation is not limited to "operation by a single agency or set of trustees or religious order." Id ., at 215, 188 N.W.2d 460. For example, the court explained, schools operated by the Franciscan Order and Jesuit Order would "be considered, along with diocesan schools, as part of the Catholic school system ... because all are 'affiliated with the same religious denomination.' " Id. , at 215-16, 188 N.W.2d 460. At the same time, officials may not determine the affiliation of a religious school by monitoring and evaluating its practices or personnel. Holy Trinity Cmty. Sch., Inc. v. Kahl , 82 Wis.2d 139, 154-58, 262 N.W.2d 210 (1978). Instead, public officials "are obliged to accept the professions of the school and to accord them validity without further inquiry." Id. , at 155, 262 N.W.2d 210 (emphasis added).
This case arose when St. Augustine applied for transportation for its students, including the Forros' children. Invoking section 121.51, the Friess Lake School District denied its request, and Wisconsin's Superintendent of Public Instruction, Tony Evers, upheld that decision. At the relevant time, St. Augustine described itself as a Catholic school. In its request for busing, the school told the district that it was "an independent, private Catholic school." In the section of its website entitled "About Us," St. Augustine stated that it is "an independent and private traditional Roman Catholic School" that "loves and praises all the traditional practices of the Catholic Faith" and "recognizes its spiritual custodial duty of establishing an authentic Catholic environment."[3]
The problem was that there was already a Catholic school within the same catchment zone-St. Gabriel School, which was operated by the Archdiocese of Milwaukee. Relying on each school's self-classification, the school district and Superintendent determined that both schools were affiliated with the same sponsoring group, as Vanko used that term. (They may have thought that if the Franciscans and Jesuits were considered as "the same" for purposes of Wisconsin law, then so were St. Augustine and St. Gabriel.) Because St. Gabriel had already qualified for busing, the district and Superintendent disclaimed any obligation under section 121.51 to provide transportation services or their monetary equivalent to St. Augustine's students.
St. Augustine and the Forros sued the school district and Superintendent in state *595 court for violations of their federal civil rights under 42 U.S.C. § 1983 and for violations of the state busing statute; the defendants removed the case to federal court. St. Augustine asserts that its students are entitled to publicly subsidized transportation and that, in rejecting their application, the state impermissibly probed into its religious beliefs. It maintains that even though it identifies itself as Catholic (specifying Roman Catholic in at least one place), it was nonetheless distinct from the diocesan schools in its curriculum and religious practices. The district court remanded the state claims to the state court and granted summary judgment in favor of the defendants on the federal claims. St. Augustine and the Forros appeal from that judgment.
II
Because this case comes to us following summary judgment, we have assessed the plaintiffs' claims and evidence de novo , Spierer v. Rossman , 798 F.3d 502, 507 (7th Cir. 2015), mindful that summary judgment is appropriate in the absence of a "genuine dispute as to any material fact" if "the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) ; see also Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For the plaintiffs to move ahead on their section 1983 claim, the record must contain evidence that would permit a trier of fact to find that "(1) they held a constitutionally protected right; (2) they were deprived of this right in violation of the Constitution; (3) the defendants intentionally caused this deprivation; and (4) the defendants acted under color of law." Donald v. Polk Cnty ., 836 F.2d 376, 379 (7th Cir. 1988).
Plaintiffs argue that the application of section 121.51 deprived them of their First Amendment rights in two ways. First, they assert that the defendants violated the Free Exercise Clause by depriving St. Augustine (and the parents of its students) of a public benefit on account of their religion. As we explain in more detail below, this theory fails because, as construed by the Wisconsin Supreme Court, section 121.51 is a facially neutral and generally applicable law that deprives all private schools-religious and secular alike-of receiving a subsidy already claimed by another school affiliated with the same group or organization. Second, plaintiffs suggest that the defendants' application of section 121.51 violated the Establishment Clause by entangling the state actors with religious doctrine and belief when they categorized St. Augustine as Catholic. This allegation lacks support in the record, which shows that it was St. Augustine-not the state-that chose to define itself as Catholic. Ironically, it is St. Augustine's approach, not the state's, that would require officials to look beyond outward expressions of affiliation to engage in potentially impermissible inquiries into the ecclesiological boundaries of religions and denominations. The district court thus properly dismissed this suit.
A
As a preliminary matter, plaintiffs incorrectly assert that a factual dispute precludes summary judgment. They believe that the record could establish that the defendants consulted St. Augustine's original articles of incorporation, which declared the institution a nondenominational Christian school, before they rejected its busing application. Had the defendants known of the articles' language, the argument goes, an impermissible inquiry into the school's religious doctrine or practice must have prompted its classification as Catholic. But plaintiffs have failed to carry their burden of producing evidence to support *596 their assertion that the defendants looked at the document. See Celotex Corp. v. Catrett , 477 U.S. 317, 322-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Without any evidence that they did so, a secondary dispute over whether St. Augustine submitted the original articles of incorporation to the state is immaterial.
Although plaintiffs suggest that a footnote in the Superintendent's decision proves that he, at least, pulled and reviewed the articles on his own, they misconstrue that note. The footnote states that St. Augustine "did not provide the complete Articles of Incorporation," which "according to the online records of the Wisconsin Department of Financial Institution" have remained in effect since their 1981 filing. This statement does not establish that the Superintendent ever saw the articles-it indicates only that he saw records of their filing. (And, while we do not base our opinion on this fact, we note that the website in question produces only a docket-style list of filings without links to their contents. Corporate Records, Saint Augustine School, Inc. , WIS. DEP'T OF FIN. INSTITUTIONS , https://www.wdfi.org/apps/CorpSearch/Details.aspx?entityID=6N08664& hash=474157237& searchFunctionID=9f86b932-7cef-4bc9-a6a5-7222036a7830& type=Simple& q=saint+augustine+school (last visited Oct. 11, 2018).) Therefore, even if it were relevant to a First Amendment analysis, plaintiffs have put forward no evidence to suggest that the defendants knew about and ignored the commitment to interdenominational Christianity professed in St. Augustine's bylaws. Because plaintiffs had no constitutional right under the First (or any) Amendment to have the defendants consult St. Augustine's articles of incorporation, their assertions that the school submitted the articles of incorporation cannot create a factual dispute sufficient to preclude summary judgment.
B
We now turn to the heart of this case: the constitutional claims. We conclude that the defendants did not violate the Free Exercise Clause when they denied St. Augustine's busing application pursuant to the religiously neutral and generally applicable grounds provided in section 121.51. Since Employment Division v. Smith , the Supreme Court has consistently held that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' " 494 U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (quoting United States v. Lee , 455 U.S. 252, 263 n.3, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (Stevens, J., concurring) ). That rule resolves the present case. The defendants refused to bus pupils to St. Augustine because another school-St. Gabriel-shared its institutional affiliation and served the same catchment zone. That the schools' shared affiliation happened to follow denominational lines in this case does not entitle plaintiffs to an exemption from a restriction placed on all private schools that have a common sponsoring group, as Wisconsin law defines it.
Plaintiffs' argument to the contrary rests on a misunderstanding of section 121.51. They repeatedly complain that the defendants denied St. Augustine (and its families) a public benefit because of St. Augustine's religious beliefs or practices. We do not doubt that section 121.51 foists a choice on religious families and schools. It requires parents to decide whether to elect the school that qualifies for benefits, or to forgo the benefits and select a school *597 that better reflects their preferred ritual, doctrine, or approach. Here, the Forros could send their children to a school that more precisely reflects their religious values only if they declined transportation benefits.
For its part, St. Augustine had to choose between identifying as Catholic and securing transit funding for its students. Were we presented with nothing but the text of section 121.51, which would appear to operate only with respect to religious schools, plaintiffs might have a strong case. To the extent that the statute "denies a generally available benefit solely on account of religious identity," it would "impose[ ] a penalty on the free exercise of religion." Trinity Lutheran Church of Columbia, Inc. v. Comer , --- U.S. ----, 137 S.Ct. 2012, 2019, 198 L.Ed.2d 551 (2017). Strict scrutiny would then apply, see id . at 2024, a burden that the defendants in this case do not attempt to meet.
Yet the Wisconsin Supreme Court took that problem off the table when it authoritatively construed the statute to avoid any such constitutional problem. See Reiser v. Residential Funding Corp. , 380 F.3d 1027, 1029 (7th Cir. 2004). As the state supreme court reads the statute, section 121.51 imposes a neutral and generally applicable limitation on transportation funding. Its ban on busing services in overlapping attendance areas applies "to all private schools affiliated or operated by a single sponsoring group, whether such school operating agency or corporation is secular or religious." State ex rel. Vanko , 52 Wis.2d at 215, 188 N.W.2d 460 (emphasis added). The state supreme court interpreted the statutory language singling out "private schools affiliated with the same religious denomination" as serving only to establish affiliation with a denomination as the operative limitation "rather than operation by a single agency or set of trustees or religious order." Id ., at 465. In determining affiliation with a religious denomination, the state generally must accept the school's own profession of affiliation or non-affiliation. Holy Trinity Cmty. Sch., Inc. , 82 Wis.2d at 155-58, 262 N.W.2d 210.
Thus, section 121.51 bars two self-identified Catholic schools from receiving transit subsidies, but it also bars funding two Montessori schools, two International Baccalaureate® schools, or two French International schools. As in the case of St. Augustine, the bar would apply even though the same corporate parent did not own or control both institutions and thus the articles of incorporation would reflect two entities. The reason why St. Augustine cannot demand services within its desired attendance zone is not because it is a Catholic school; it is because-by its own choice-it professes to be affiliated with a group that already has a school in that zone.[4] By the same token, Wisconsin is not denying the Forros a transit subsidy because they are Catholic or because they seek to send their children to Catholic school. It funds transportation for all of the Catholic families who send their children to St. Gabriel. The problem for St. Augustine is not that it is Catholic; it is that it is second in line.
Because section 121.51 does not deny benefits on the basis of their religion, neither St. Augustine School nor the Forros can obtain relief under the Free Exercise Clause. See Smith , 494 U.S. at 879, 110 S.Ct. 1595. Section 121.51 imposes a neutral and generally applicable restriction on transit funding. The defendants thus did not violate the Free Exercise Clause when *598 they relied on section 121.51 to deny St. Augustine's busing application.
C
Plaintiffs also assert that, as applied in this case, section 121.51 violates the Establishment Clause. We agree with them that the state may neither define nor police religious orthodoxy. But they have not shown that the state did any such thing. Contrary to the dissent's assertions, the record contains no evidence of an impermissible inquiry into the religious character of St. Augustine, let alone a comparison of the respective doctrines and practices of St. Augustine, St. Gabriel, and other Catholic institutions.
Had the defendants applied a religious test to establish denominational affiliation, we can assume that they would have violated Lemon 's prohibition of entanglement between government and religion. Lemon v. Kurtzman , 403 U.S. 602, 613, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). A long line of cases prohibits secular courts from delineating religious creeds or assessing compliance with them. E.g. , Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church , 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969) (prohibiting courts from judging adherence to denomination's traditional doctrines). In fact, the state may not even monitor a religious school to identify which aspects of its curriculum and courses contain religious content generally. New York v. Cathedral Acad. , 434 U.S. 125, 132-33, 98 S.Ct. 340, 54 L.Ed.2d 346 (1977) (disapproving of a scheme that required state to identify "any religious content in various classroom materials" as part of a reimbursement process, id . at 133, 98 S.Ct. 340 ); Lemon , 403 U.S. at 619, 91 S.Ct. 2105 (invalidating Rhode Island salary supplements for parochial teachers' secular teaching because "comprehensive, discriminating, and continuing state surveillance w[ould] inevitably be required to ensure that" teachers' religious beliefs did not infect their teaching). Thus, had the defendants determined that St. Augustine was Catholic on the basis of an affinity between its teachings or practices and those sanctioned by chosen dioceses, orders, or prelates, we would have found the defendants' inquiry to be unconstitutional.
Plaintiffs assert that such a forbidden probe lay behind the denial of St. Augustine's busing application. They argue that the defendants "based their finding of affiliation on the conclusion that St. Augustine and St. Gabriel were theologically connected even though St. Augustine said that it was 'religiously distinct' from the schools of the Archdiocese." The current system, St. Augustine argues, impermissibly permits the state "to decide who is and is not in the same religious denomination based on something other than legal and secular connections, and to ignore the claims of religious adherents about whether they are and are not religiously distinct."
The problem with St. Augustine's argument is that the school district and state superintendent did not consider St. Augustine's theology or its religious practices. They did not, to use plaintiffs' words, "ignore the claims of religious adherents about whether they are [or] are not religiously distinct" from another denomination. The defendants did not independently assign the label "Catholic" to St. Augustine. St. Augustine did. The defendants read and credited St. Augustine's statements on its website and busing request form that it was a Catholic-specifically a Roman Catholic-school. Defendants properly avoided wading into any discussion about whether each school faithfully operates within the Catholic tradition because each one calls itself a Catholic School. The *599 dissent claims that the state superintendent "examined extensively the theological statements on the School's website and determined that it evinces an affiliation with the Catholic Church." But it cites a portion of the Superintendent's decision that does no more than quote verbatim the school's own description of itself as a "Roman Catholic School" providing an education to "the children of our Catholic community" while "lov[ing] and prais[ing] all the traditional practices of the Catholic faith." R. 26-10, at 7. Taking a party's repeated chosen label at face value hardly constitutes a deep-dive into the nuances of religious affiliation.
Plaintiffs contend that section 121.51 also required the defendants to consider statements in the school's articles of incorporation and bylaws, which purportedly would have shown that the school's leadership disclaimed affiliation with the Catholic Church. But why does the Constitution compel exclusive reliance on that evidence, as opposed to the school's express statement on its application for benefits? We know of no such rule. Of course, as Holy Trinity illustrates, St. Augustine is free to change its affiliation, and the state must also respect such a change. See 82 Wis.2d at 146, 262 N.W.2d 210. But at least in our case, all evidence viewed by the school district and superintendent indicated that St. Augustine and St. Gabriel professed affiliation with the same Roman Catholic Church.
We see no evidence to support plaintiffs' and the dissent's hypothesized parade of horribles. Under the current system, they contend that the state could redefine denominational boundaries and "lump the Lutherans of the Missouri Synods in with those in the Evangelical Lutheran Church in America" while "Anglican Catholics could be thrown in with the Roman Catholics" because "each of them use the 'Lutheran,' [and] Catholic,' ... monikers." That is just to say, however, that there can be a question about which entity is the "group" to which section 121.51 refers. We assume that the Missouri Synods would be entitled to argue that they are a different group from the Evangelicals, that the Orthodox Jews are entitled to argue that they are a different group from Reformed Jews, and that Shi'a Muslims can urge that they are different from Sunnis. We are content to save those cases for another day. In the present case, both St. Augustine and St. Gabriel self-designated as Roman Catholic, and that is enough. If we were presented with a state's refusal to recognize a denomination or a public official's attempt to serve as an arbiter of a religious schism, we would have a different case. We agree with our dissenting colleague that labels may not fully capture the plurality of religious beliefs in America. But for Wisconsin's statute to pose any meaningful limitation on the state's provision of busing, school districts must be able to rely on self-adopted labels.
Ironically, it is St. Augustine and the Forros-not the state-that are asking us to undertake an unconstitutional analysis of religious belief. They contend that St. Augustine is distinct because it "practices its religion differently than St. Gabriel." They argue that "even if similar practices or beliefs could be the basis for 'affiliation,' " the denial of St. Augustine's busing application cannot stand because the defendants "explicitly did not look at or compare St. Augustine's beliefs and practices with St. Gabriel's to determine whether they were sufficiently comparable such that they could be considered 'affiliated' or sponsored by some group.' " Yet considering whether a difference in belief constitutes a difference in denomination is precisely *600 what Presbyterian Church forbids.[5] 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658. The entire point of the approach endorsed by the Wisconsin Supreme Court and followed by the defendants is to take matters of doctrine and belief out of the secular determination of institutional affiliation. We will not pervert the Establishment Clause to declare internal doctrinal differences a matter of state concern. Nor are we prepared to say, in conflict with the Wisconsin Supreme Court, that the state's only choice is to assume that each and every school is unique and thus all children must receive transportation benefits.
Before concluding, we add a word about why we think it both unnecessary and inappropriate to abstain sua sponte from deciding the issues before us pursuant to the doctrine of Railroad Commission of Texas v. Pullman Co. , 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). The Wisconsin Supreme Court has already resolved the critical questions of state law in Vanko and Holy Trinity Church . It has told state authorities how to apply the test of affiliation with a single sponsoring group, and it has stressed that the responsible state officials must accept a religious organization's self-characterization. It has also disapproved the factor on which our dissenting colleague relies so heavily-ownership or control by a single entity. Pullman does not require a federal court to stay its hand simply because a state legislature or court might surprise us by reversing course. See Kusper v. Pontikes , 414 U.S. 51, 55, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973) (rejecting Pullman abstention where alternative interpretation of state law was "foreclosed by the decision of the" state high court).
The Pullman doctrine aims to avoid an unnecessary adjudication of the constitutionality of a state statute. Its purpose is not served unless there is "some risk that the statute will be found unconstitutional unless narrowed." Mazanec v. N. Judson-San Pierre Sch. Corp. , 763 F.2d 845, 847 (7th Cir. 1985). As it comes to us, this was not a close case. St. Augustine complains that its religious exercise was burdened by a neutral and generally applicable law. It roots an Establishment Clause violation in the failure of the district and state officials to contrast its religious dogma and practices with those of the Roman Catholic diocese. And that is what inevitably would be required: two schools could be incorporated under the same entity and nonetheless differ just as much as St. Augustine and St. Gabriel do. This is not one of those cases in which we must side-step our obligation to resolve a case that is properly before us.
III
The district court properly granted summary judgment for the defendants. St. Augustine and the Forros have not shown a violation of their First Amendment rights. As applied here, section 121.51 neither impinged on plaintiffs' religious liberties nor impermissibly engaged the state in matters of religious doctrine. We therefore AFFIRM the judgment of the district court.

The dissent characterizes the Superintendent's actions as an "extensive" examination of the school's theological affiliation. Post at 595-96 n.8. As we explain below, however, that is not at all what happened. All the Superintendent did was to look at the school's own description of itself as "Catholic" and take its word for it. He did not delve into corporate niceties, educational materials, or anything else that would inappropriately have entangled him with matters of religion. Nor did the Superintendent ever assume, one way or the other, anything about the school's affiliation with the archdiocese of Milwaukee or any other subdivision of the Catholic Church, or the similarity (or differences) in the beliefs held by each one.

Districts may discharge this obligation by making a direct payment to pupils' parents. Wis. Stat. § 121.55(1)(b).

Although not pertinent here (because it was not a factor on which the Superintendent relied), we note that St. Augustine's employment application asks applicants about their "Catholic Background," including their "views as a Catholic teacher on why you wish to teach in a small, private school teaching in the Catholic tradition" and "what [they] expect from a truly Catholic educational institution."

We know from Holy Trinity that if St. Augustine professed to be anything but Catholic, that statement too would have to be taken at face value, and we would not have this case.

It is hardly unusual for churches within the same denomination to display some differences. One Lutheran church might have a pastor who emphasizes public service, while another might have a minister who emphasizes self-reflection and atonement. One might approach the Bible from a strict-construction viewpoint, while another may take a more metaphorical view. Differences in theological approaches do not necessarily create different sponsoring groups, no matter how genuinely each congregation feels about its choices.