In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-2333

ST. AUGUSTINE SCHOOL, *et al*,

*Plaintiffs-Appellants*,

*v.*

JILL UNDERLY, in her
official capacity as Superintendent
of Public Instruction, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:16-cv-00575 — **Lynn Adelman**, *Judge*.

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES
AND AFTER CERTIFICATION TO THE WISCONSIN SUPREME COURT
— DECEMBER 20, 2021

Before RIPPLE, KANNE, and WOOD, *Circuit Judges*.

WOOD, *Circuit Judge*. The State of Wisconsin provides
transportation benefits to most of its school-aged children. See
Wis. Stat. §§ 121.51, 121.54. For private-school students,

however, it limits those benefits to only one school "affiliated or operated by a single sponsoring group" within any given attendance area. That may seem like a straightforward criterion, but the fact that this case is now on its second trip to the Seventh Circuit, after intermediate stops at the Supreme Court of the United States and the Wisconsin Supreme Court, demonstrates that complexities abound when a private school's affiliation is religious in nature. The particular question before us is whether the state Superintendent of Public Instruction, then Tony Evers (the present Governor of the state), correctly decided that St. Augustine School, a free-standing entity that describes itself as Catholic but independent of the church's hierarchy, is "affiliated with or operated by" the same sponsoring group as St. Gabriel High School, which is run by the Archdiocese of Milwaukee and therefore indisputably Catholic. (Governor Evers's successor in the post of Superintendent is now Jill Underly, whom we have substituted as the appellee.)

In 2018, we concluded that the two schools were affiliated with the same sponsoring group—the Roman Catholic church. This meant that children attending St. Augustine were not entitled to the state's transportation benefit, because St. Gabriel's was located in the same attendance area, and its students were already receiving that benefit. As the second applicant, we thought, St. Augustine did not qualify under the state statute. See *St. Augustine School v. Evers*, 906 F.3d 591 (7th Cir. 2018) (*St. Augustine I*). The Supreme Court vacated that decision and remanded the case to us for further consideration in light of *Espinoza v. Montana Dept. of Revenue*, 140 S. Ct. 2246 (2020). See *St. Augustine School v. Taylor*, 141 S. Ct. 186 (2020). After receiving supplemental briefs that addressed both *Espinoza* and the potential impact of *Fulton v. City of*

*Philadelphia*, 141 S. Ct. 1868 (2021) (at that time yet-to-be de-
cided), we realized that we needed guidance from the Wis-
consin Supreme Court on the proper way to determine "affil-
iation" under state law. We therefore certified that question to
the state's highest court, which generously accepted our re-
quest and responded in an opinion issued in July 2021. See *St.
Augustine School v. Taylor*, 961 N.W.2d 635 (Wis. 2021) (*St. Au-
gustine II*).

At this stage, all that remains is for us to apply the instruc-
tions of the state supreme court to the facts of this case, and
thereby (we hope) come closer to resolving this long-running
dispute. Those instructions gave us broad principles for deci-
sion, rather than particularized factors:

> [I]n determining whether schools are "affiliated with
> the same religious denomination" [*i.e.*, the same spon-
> soring group] pursuant to Wis. Stat. § 121.51, the Su-
> perintendent is not limited to consideration of a
> school's corporate documents exclusively. In conduct-
> ing a neutral and secular inquiry, the Superintendent
> may also consider the professions of the school with
> regard to the school's self-identification and affiliation,
> but the Superintendent may not conduct any investi-
> gation or surveillance with respect to the school's reli-
> gious beliefs, practices, or teachings.

961 N.W.2d at 637. As we read these instructions, the Super-
intendent is not limited to formal corporate documents in her
assessment of affiliation. Nonetheless, as a matter of state law
she may not delve into "the school's religious beliefs, prac-
tices, or teachings," because the latter inquiry would trans-
gress the First Amendment prohibition against excessive

entanglement with religious matters. See *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971).

We conclude that the Superintendent's decision in the case before us was not justified by neutral and secular considerations, but instead necessarily and exclusively rested on a doctrinal determination that both St. Augustine and St. Gabriel's were part of a single sponsoring group—the Roman Catholic church—because their religious beliefs, practices, or teachings were similar enough. The fact that the Superintendent reached this result largely just by looking at St. Augustine's description of itself on its website does not matter—the doctrinal conclusion was an inescapable part of the decision. We therefore reverse the judgment of the district court and remand for further proceedings.

**I**

A brief review of Wisconsin law is necessary in order to understand the way in which we must apply the state supreme court's guidance. Two state statutes are relevant: Wis. Stat. § 121.54, and Wis. Stat. § 121.51. The first of those generally addresses the topic of transportation provided by Wisconsin's public-school districts. It provides as follows in relevant part:

> Except as [otherwise] provided …, the school board of each district operating high school grades shall provide transportation to and from the school a pupil attends for each pupil residing in the school district who attends any elementary grade, including kindergarten, or high school grade at a *private school* located 2 miles or more from the pupil's residence, if such private school is a school within whose *attendance area* the

pupil resides and is situated within the school district or not more than 5 miles beyond the boundaries of the school district measured along the usually traveled route.

Wis. Stat. § 121.54(2)(b)1 (emphasis added). On its face, this law contains no restrictions on private-school students, but there is more here than meets the eye. Section 121.51 defines the term we have emphasized, "attendance area," for purposes of transportation:

In this subchapter:

(1) "Attendance area" is the geographic area designated by the governing body of a private school as the area from which its pupils attend and approved by the school board of the district in which the private school is located. If the private school and the school board cannot agree on the attendance area, the state superintendent shall, upon the request of the private school and the board, make a final determination of the attendance area. *The attendance areas of private schools affiliated with the same religious denomination shall not overlap* unless one school limits its enrollment to pupils of the same sex and the other school limits its enrollment to pupils of the opposite sex or admits pupils of both sexes.

Wis. Stat. § 121.51(1) (emphasis added). Long ago, the Wisconsin Supreme Court construed the term "the same religious denomination" in this statute to mean "a single sponsoring group," in order to avoid the possibility of incompatibility with the Religion Clauses of the First Amendment. See *State ex rel. Vanko v. Kahl*, 188 N.W. 2d 460 (Wis. 1971). Neither party

asked the Wisconsin Supreme Court to revisit *Vanko* in the course of deciding our certified question, and so it expressly "decline[d] to overrule or revisit" that case. See *St. Augustine II*, 961 N.W.2d at 643.

The *Vanko* court also offered an example of what it means to be "affiliated with" the same religious denomination:

> [I]f the Franciscan Order of the Roman Catholic church operates a school in the northern part of the Racine district, and the Jesuit Order operates a school in the southern part of the district, they are to be considered, along with diocesan schools, as part of the Catholic school system of Racine because all are 'affiliated with the same religious denomination.' It means that, and nothing more.

*Vanko*, 188 N.W.2d at 465. Importantly, however, neither the Franciscans, nor the Jesuits, nor the Diocese was involved in that case, and none of them attempted to challenge the assumption that they were all affiliated with the same religious denomination. The court thus had no need to resolve the precise question now before us.

The other pertinent case from the Wisconsin Supreme Court (apart from *St. Augustine II*) is *Holy Trinity Community School, Inc. v. Kahl*, 262 N.W.2d 210 (Wis. 1978). There the question was whether a school district erred by looking behind the Holy Trinity Community School's representation that it was nondenominational. The district questioned the accuracy of that statement, because up until a short time earlier, the school had been formally affiliated with the Roman Catholic church. The state supreme court ruled that in applying the state statutes, the Superintendent unlawfully had entangled

the state in religious affairs. 262 N.W.2d at 215. In order to avoid that type of intrusion, which the court found incompatible with the First Amendment's Establishment Clause, the court adopted the following rule:

> [T]o make the inquiry and to determine that the school is or is not affiliated with the Catholic denomination is to make an impermissible inquisition into religious matters. We are obliged to accept the professions of the school and to accord them validity without further inquiry.

262 N.W.2d at 217.

In *St. Augustine I*, we held that the Superintendent had done no more than what *Holy Trinity* requires—that is, he had "accept[ed] the professions of [St. Augustine School] and [had] accord[ed] them validity without further inquiry." Our dissenting colleague disagreed with this characterization. In his view, there was a critical intermediate step in our case that did not exist in *Vanko* or *Holy Trinity*: namely, whether, when St. Augustine described itself as "Catholic," it was also saying that it understood itself to be part of the same sponsoring group as St. Gabriel's. That step required an "inquisition into religious matters," as he saw it, and thus was impermissible under *Holy Trinity*.

Upon closer examination, we are now persuaded that there are meaningful differences between the situation before us and the one in *Holy Trinity*. These differences help to explain why the Superintendent's seemingly simple acceptance of St. Augustine's statement that it is "Catholic" does not end the matter. *Holy Trinity* concerned a situation where a school professed that it was independent of any religious

organization and had demonstrated legal independence through its corporate charter and bylaws. This represented a change from its former structure, which did involve a church affiliation. An examination of just the kind of neutral and secular factors that *St. Augustine II* called for corroborated the school's independent self-identification. The *Holy Trinity* court thus concluded that the Superintendent had been wrong to find that the school was *de facto* still affiliated with the church.

Determining whether a school has broken away from a sponsoring organization is not the same as looking at two schools and asking whether the same organization is behind both of them. The former situation requires us to compare the "before" and "after" for the school—relying only on neutral and secular factors—and see if it has severed an affiliation. The latter situation calls for a determination whether two separate schools are both sponsored by a single entity. The latter task is difficult when one of the schools says that it has always been independent, even though some doctrinal similarities with other schools are evident.

Without a neutral and secular basis, a determination of "affiliate[ion]" for purposes of the Wisconsin statutes cannot rest exclusively on the fact that two schools say only that they are Christian, or Islamic, or Jewish. That is too high a level of generality to support a finding that both operate under the aegis of a single sponsoring organization. No one doubts that there are significant religious differences between Roman Catholics and Protestants, between Presbyterians and Baptists, between Sunni and Shi'a Muslims, and between Orthodox and Reform Jews, just to name a few examples where umbrella labels cover distinctive faiths. Wars have been fought,

and in some instances are still underway, over these matters. One need only recall the hostilities that still exist between the Shi'a and the Sunni branches of Islam, or the lengthy violence in Northern Ireland between the Protestant unionists and the Catholic separatists. And as recently as 2021 there have been calls by conservative Methodists to split away from the larger denomination. See https://www.christianitytoday.com/news/2021/march/conservative-umc-split-postponed-global-methodist-church.html. Finally, there are serious tensions within Judaism among the ultra-Orthodox, Orthodox, and Reform groups.

We therefore understand from *St. Augustine II* that the Wisconsin statutes do *not* permit a finding of affiliation based on a public official's assessment of how close in doctrine two sectarian schools may be. However difficult it may be, the court has instead called for that decision to be made on neutral and secular grounds. We endeavor in this opinion to shed some light on that process.

**II**

The present case arose when Joseph and Amy Forro, parents of children at St. Augustine School, sought to qualify for transportation benefits. They offered two primary theories in support of their case. First, they contended that the Superintendent deprived them of a public benefit on account of their religion, in violation of the Free Exercise Clause; and second, they argued that the Superintendent's application of the attendance-area statute violated the Establishment Clause, because the methodology he used to characterize the two schools excessively entangled the state with religious doctrine.

Given the state supreme court's decision, we do not find it necessary to reach any constitutional issues in this case. Instead, it is enough to decide whether the Superintendent properly applied Wisconsin law when he characterized the two schools as affiliated. In *St. Augustine I*, we rejected the Forros' first argument, because as we saw it, religion played no direct part in the Superintendent's decision: had St. Augustine been the incumbent school and St. Gabriel the newcomer, it would have been St. Gabriel whose students would have been ineligible. The same would have happened, we thought, for a second secular school affiliated with the same organization. Being second in line has nothing to do with religion, and it appeared to us that this criterion was neutrally applied. We need not pursue this theory further, however.

We turn instead to the Wisconsin Supreme Court's description in *St. Augustine II* of the proper way to determine affiliation for purposes of Wis. Stat. § 121.51. The overarching message the court sent was that the state officials conducting the affiliation inquiry must confine themselves to "neutral and secular" factors. 961 N.W.2d at 637. Just as the court had held in *Holy Trinity*, anything that involves the probing of the beliefs held by a religious institution at issue is not permitted by state statute, because it is at least possible that such an inquiry may stumble into constitutional problems. In making this "neutral and secular" inquiry with respect to religiously affiliated schools, the state officials are "not limited to consideration of a school's corporate documents exclusively." *Id.* It is also permissible for them to look at "the professions of the school with regard to the school's self-identification and affiliation." *Id.* Other neutral considerations are also permissible—perhaps facts such as the presence or absence of resource sharing or joint operations. Although this is the same

methodology that should be used with secular sponsoring organizations, we note that the application of the test is likely to be easier for secular schools, because the question of religious doctrine will not arise.

We note that in *St. Augustine II*, some justices would have placed great weight on mutuality of commitment between two organizations, as a key neutral factor that would reveal whether both schools are affiliated with a single sponsoring organization. They found it hard to imagine a one-way "affiliation"—a relationship that one side embraces, but the other side abjures. The majority of the justices, however, did not find that mutual agreement to affiliate is essential. Nonetheless, even under the majority's view, we do not understand the court to have forbidden *any* consideration of mutuality. If both schools affirmatively proclaim their affiliation with one sponsoring entity, we see no reason why the Superintendent could not take that fact into account.

The Wisconsin Supreme Court, in an effort to construe the state statutes in a way that does not give rise to problems under the Religion Clauses, has instructed that those statutes forbid the Superintendent from delving into the nuances of the religious differences that pervade our country and withholding state benefits for reasons that can be tied to the religious preference of the disfavored group. See *Espinoza*, 140 S. Ct. at 2255. Yet that is what reliance on the label "Catholic" entailed here, even if only modestly. Given the fluidity of religious labels and this country's firm commitment to personal choice and religious diversity, it may be impossible to decide that two entities are affiliated by looking solely at the fact that they both use the same label. Moreover, we can find no reason why the state was entitled to accept St. Augustine's self-

characterization as Catholic, while at the same time to reject
its vociferous insistence that its understanding of what it
means to be Catholic is significantly different from that of the
diocesan schools. Neither representation was more or less im-
portant to St. Augustine's self-identification. While in other
circumstances an entity may make the type of neutral and sec-
ular statement that is within bounds for the state to consider,
this is not such a case.

### III

This is an appeal from the district court's grant of sum-
mary judgment in favor of the state defendants. With the ben-
efit of the guidance we received from the Wisconsin Supreme
Court, we conclude that it was error to rule for the state. Be-
cause the case was dismissed before the district court had oc-
casion to determine the amount of monetary damages (if any)
to which the Forros or St. Augustine might be entitled, or what
type of injunctive relief (if any) for any plaintiff is proper, we
REVERSE the judgment of the district court and REMAND
for further proceedings consistent with this opinion.