In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 22-2786 & 22-2846

ST. AUGUSTINE SCHOOL, *et al.*,

*Plaintiffs-Appellants/Cross-Appellees,*

*v.*

JILL UNDERLY, *et al.*,

*Defendants-Appellees/Cross-Appellants.*

_____

Appeals from the United States District Court for the
Eastern District of Wisconsin.
No. 2:16-cv-00575 — **Lynn Adelman**, *Judge.*

_____

ARGUED MARCH 31, 2023 — DECIDED AUGUST 14, 2023

_____

Before EASTERBROOK, RIPPLE, and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* This long-running case arose in 2015, when Amy and Joseph Forro, whose three children attended St. Augustine School, a self-identified Catholic school in Hartford, Wisconsin, requested transportation benefits from the State of Wisconsin. Wisconsin provides such benefits for parents who send their children to private sectarian schools. See Wis. Stat. § 121.54. This time, however, the responsible school district and the state superintendent of public instruction (the

Superintendent) denied the parents' request because the state was already providing transportation benefits to St. Gabriel, another Catholic school operating in the same area. In so doing, the state authorities were attempting to follow a Wisconsin law that stipulates that only one school from a single organizational entity in each "attendance area" may qualify for benefits. See Wis. Stat. § 121.51. But the links between St. Augustine and St. Gabriel were only skin-deep. Although they both proclaim an affiliation with Catholicism, the two schools are not affiliated with one another in other significant ways. This fact led St. Augustine and the Forros to sue for benefits they believe were wrongfully withheld. (Unless the context requires otherwise, we refer to the plaintiffs collectively as the Forros.)

Several years of litigation ensued, including a trip up and back from the U.S. Supreme Court, *St. Augustine School v. Taylor*, 141 S. Ct. 186 (2020) (mem.), two published opinions from this court, *St. Augustine School v. Evers*, 906 F.3d 591 (7th Cir. 2018) (*St. Augustine I*), and *St. Augustine School v. Underly*, 21 F.4th 446 (7th Cir. 2021) (*St. Augustine IV*), cert. denied, 142 S. Ct. 2804 (2022) (mem.), one nonprecedential disposition from this court, *St. Augustine School v. Taylor*, No. 17-2333, 2021 WL 2774246 (7th Cir. Feb. 16, 2021) (*St. Augustine II*), and a published opinion from the Supreme Court of Wisconsin, *St. Augustine School v. Taylor*, 2021 WI 70 (*St. Augustine III*). After all that, the Forros were vindicated. In *St. Augustine IV*, with the benefit of the state supreme court's authoritative interpretation of the relevant state law in *St. Augustine III*, we concluded that the Superintendent's denial of transportation benefits violated Wisconsin law, because it rested on an improper methodology for determining affiliation between two schools of similar faith. The case is now back before us again. All that is

left to decide is whether the district court erred in the remedies it imposed based on this confirmed state-law violation. Seeing no reversible error, we affirm.

**I**

We are concerned with the State of Wisconsin's statutory scheme for providing transportation benefits to students who attend private schools. See Wis. Stat. §§ 121.51, 121.54. This is a topic that both we and the Supreme Court of Wisconsin have explored carefully, as the history we have just reviewed illustrates. We provide further details here.

A

Wisconsin law requires local school districts to provide transportation benefits to private schools, see Wis. Stat. § 121.54, but it sets limits on that obligation. Pertinent here, in each geographic attendance area, only one school "affiliated with the same religious denomination" may claim those benefits. See Wis. Stat. § 121.51. To avoid a possible constitutional problem if only religiously affiliated schools were restricted, the Supreme Court of Wisconsin years ago interpreted Wis. Stat. § 121.51 more broadly, so that it applies to "all private schools affiliated or operated by a single sponsoring group, … secular or religious." *State ex rel. Vanko v. Kahl*, 52 Wis. 2d 206, 215 (1971). The law contemplates that a second school associated with any group, secular or sectarian, is not entitled to this benefit; it goes only to the first applicant. Again hoping to avoid constitutional problems, the state supreme court has also clarified that the inquiry into religious affiliation must be limited, lest the state cross the line into improper entanglement with religious matters. The school district, and ultimately the Superintendent, must take a school's self-

representations, articles of incorporation, and bylaws at face value. See *Holy Trinity Community School, Inc. v. Kahl*, 82 Wis. 2d 139, 157–58 (1978).

St. Augustine School is a private "Traditional Catholic" school that previously was located within the Friess Lake School District, though a recent district consolidation has placed it in the Holy Hill Area School District. Because Holy Hill is a successor in interest to Friess Lake, this consolidation has no effect on the issues before us. In 2015, St. Augustine and the Forros applied for transportation benefits for the three Forro children. State law permits those benefits to be either in-kind or financial, and this case has focused on the latter option. The parties agree that the cost of those transportation benefits is $1,500 per year. Friess Lake denied the request because in its view there was already a Catholic school, St. Gabriel School, operating in the same attendance area and receiving transportation benefits.

The Forros appealed the denial to the Superintendent (Tony Evers at the time, now Jill Underly). St. Augustine argued that, unlike St. Gabriel, it is not affiliated with the Archdiocese of Milwaukee and it follows a different religious curriculum. In essence, it disclaims the existence of any common sponsoring group. Without such a common group, the Forros' request for benefits should have been granted. The Superintendent concluded, however, that the two schools were both affiliated with Roman Catholicism. In doing so, he relied on each school's self-identification as reflected on its website and did not probe below each one's statement that it was Roman Catholic. Based on that methodology, he denied the appeal. The Forros then brought this lawsuit.

B

Since then, the case has been before numerous courts. In order to place the issues now before us in context, we need to go back to basics. We begin by recalling the distinction between a legal claim and a theory supporting relief (what the common law used to call a cause of action). A claim is the set of operative facts that produce an assertable right in court and create an entitlement to a remedy. A theory of relief is the vehicle for pursuing the claim; it may be based on any type of legal source, whether a constitution, statute, precedent, or administrative law. The specific theory dictates what the plaintiff needs to prove to prevail on a claim and what relief may be available. One lawsuit may raise multiple claims, and each claim may be supported by multiple theories.

Those concepts play a major role in this appeal. The Forros filed suit in 2016 against the school district and the Superintendent in state court pursuing *a single claim*, in the sense of a common nucleus of operative fact. Simply put, they wanted transportation benefits for their children. They supported that claim with several theories, some premised on state law and others premised on the Religion Clauses of the First Amendment. By way of relief, they asked for a declaratory judgment, damages, injunctive relief, costs and attorneys' fees, and any further relief that might be appropriate.

As parties normally do, the Forros advanced their federal theories through 42 U.S.C. § 1983, which creates a private right of action against every state actor who has deprived a person of rights secured by the federal constitution or laws. They asserted that their rights under both the Free Exercise Clause and the Establishment Clause of the First Amendment had been violated. To show that the school district and

Superintendent had impermissibly infringed on their right to free exercise, the Forros had to show that the state actors had "burdened [plaintiffs'] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton School Dist.*, 142 S. Ct. 2407, 2422 (2022) (quoting *Employment Division v. Smith*, 494 U.S. 872, 880 (1990)).

As for the Establishment Clause, the Forros tried to prove a violation based on the state's alleged preference for one form of Catholicism over another. See *Board of Education v. Grumet*, 512 U.S. 687, 703 (1994) ("[G]overnment should not prefer one religion to another, or religion to irreligion."). When this litigation began, the Forros thought that they needed to show that the state policy lacked a "secular legislative purpose"; that the "primary effect" of the policy "advance[d] or inhibit[ed] religion"; or that the policy "foster[ed] 'an excessive government entanglement with religion,'" following *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971) (quoting *Walz v. Tax Commission*, 397 U.S. 664, 674 (1970)). By now, however, *Lemon* has been abrogated by the U.S. Supreme Court. See *Kennedy v. Bremerton School Dist.*, 142 S. Ct. 2407, 2427–28 (2022). We mention it here only because its approach to proving an Establishment Clause violation shaped the Forros' original pleadings. The Forros also might have shown that the defendants' conduct was inconsistent with historical practices permitted by the Establishment Clause. See *Town of Greece v. Galloway*, 572 U.S. 565, 577 (2014).

The Forros also raised state-law theories under Wisconsin's common-law *certiorari* review and its Uniform Declaratory Judgments Act, Wis. Stat. § 806.04. "Certiorari is a mechanism by which a court may test the validity of a decision rendered by a municipality, an administrative agency, or an

inferior tribunal." *Ottman v. Town of Primrose*, 2011 WI 18, ¶ 34. Under common-law *certiorari*, a decision should be invalid if the municipality (or its equivalent) strayed outside its jurisdiction; used an incorrect theory of law; took an action that was "arbitrary, oppressive, or unreasonable and represented its will and not its judgment"; or if the evidence called the decision into question. *Id.* at ¶ 35. Damages and injunctive relief are not available under this theory. See *Coleman v. Percy*, 96 Wis. 2d 578, 588–89 (1980). Finally, under the Uniform Declaratory Judgments Act, the Forros could have established their entitlement to a declaration of "rights, status, and other legal relations" and any supplemental relief, *including damages or an injunction*, deemed "necessary or proper" based on that declaration. Wis. Stat. § 806.04.

As we said, the Forros initially filed this case in state court, but the defendants removed it to federal court because the section 1983 theories raised federal questions. See 28 U.S.C. § 1441. The district court had subject-matter jurisdiction over those federal questions, see 28 U.S.C. § 1331, and supplemental jurisdiction over the state-law theories, see 28 U.S.C. § 1367. In June 2017, the district court granted summary judgment to the defendants on the federal-law theories. With respect to the Free Exercise Clause, the court reasoned that "plaintiffs have not met their burden to produce evidence from which a reasonable trier of fact could conclude that the defendants either have treated or would treat such secular schools differently"; therefore, plaintiffs could not show that Wis. Stat. § 121.54 was applied in a manner that was not neutral or not generally applicable. As for the Establishment Clause, the Forros had attempted to show that the school district and Superintendent had impermissibly entangled themselves with religious matters. The district court was not

persuaded. It found to the contrary that there was no evidence of "any participation in, supervision of, or intrusive inquiry into religious affairs." Having resolved both federal-law theories in defendants' favor, the court relinquished supplemental jurisdiction over the state-law theories on the ground that they "raise[d] a novel or complex issue of State law." See 28 U.S.C. § 1367(c)(1).

After a case is returned to state court on remand from a federal district court, Wisconsin law allows a party "within one year … , [to] make appropriate motion for further proceedings." Wis. Stat. § 808.08. Plaintiffs chose not to file anything in state court, but they *did* appeal the district court's decision and final judgment, thereby keeping the federal case alive. On appeal, the court of appeals has jurisdiction over the entirety of the "appealable order." Fed. R. App. P. 3(c)(4). "An appellant may designate only part of a judgment or appealable order by expressly stating that the notice of appeal is so limited," but "[w]ithout such an express statement, specific designations do not limit the scope of the notice of appeal." Fed. R. App. P. 3(c)(6).[1]

Here, the Forros filed a notice of appeal that covered the entirety of the district court's decision and order granting summary judgment. There was no express statement limiting the notice of appeal to the federal theories. When we addressed that appeal in *St. Augustine I*, we considered all

---

[1] This is the current language of Rule 3. The Rule was amended in 2021 to make clear that parties are under no obligation to designate every order of the district court that they wish to challenge on appeal; it is enough to designate "the judgment—or the appealable order—from which the appeal is taken." Fed. R. App. P. 3(c)(1)(B). This change did not affect the law in this circuit, and so it has no effect on the Forros' case.

aspects of the district court's final judgment, including the parts of the judgment that remanded the state-law theories to state court. See *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 640 (2009) ("[T]he [district] court's determination [under section 1367(c)] may be reviewed for abuse of discretion … ." (quoting 16 Moore's Federal Practice § 106.05, 106–27 (3d ed. 2009))).

In that first round of appellate review, a majority of the panel agreed with the district court. *St. Augustine I* held that summary judgment was proper with respect to the Forros' contentions that the state had violated the federal Free Exercise and Establishment Clauses. See 906 F.3d at 596, 598. We did not expressly rule on the district court's relinquishment of supplemental jurisdiction, but there was no need to do so. The Forros had not convinced us to revive their federal-law theories, and we had no reason *sua sponte* to reach the state-law theories.

Judge Ripple dissented in *St. Augustine I*, expressing concern about the correctness of treating denominational labels as conclusive. Such an inquiry, he believed, violates the First Amendment because it does not rely on the same neutral principles that would be used to evaluate a request from a secular school. The use of denominational labels also impinged on the personal religious beliefs of St. Augustine, in his view, by effectively compelling it and its families to change their denominational identification. See *St. Augustine I*, 906 F.3d at 604–06 (Ripple, J., dissenting). That said, once *St. Augustine I* was decided, the plaintiffs were finished with federal court, save their ability to seek further review in the Supreme Court. They also had the option of pursuing their state-law theories in state court.

The Forros opted to seek further federal-court intervention. They first petitioned for rehearing or rehearing *en banc*; when those requests were denied, they petitioned the Supreme Court for a writ of *certiorari*. The Supreme Court issued that writ, vacated our judgment in *St. Augustine I*, and remanded the case to us for further consideration in light of *Espinoza v. Montana Department of Revenue,* 140 S. Ct. 2246 (2020). See *St. Augustine School v. Taylor*, *supra*, 141 S. Ct. 186.

On remand, as instructed, we took a careful look at *Espinoza* to see how it affected this litigation. See *St. Augustine II*, 2021 WL 2774246, at *2. *Espinoza* involved an as-applied challenge to a Montana constitutional provision that affirmatively *banned* aid to sectarian schools ("no-aid provision"). Montana had developed a state scholarship program for students attending private schools, but the Montana Supreme Court dissolved the program because it thought that scholarships for students from religious schools would violate the no-aid provision. *Espinoza*, 140 S. Ct. at 2252–53. The Supreme Court held that this application of the no-aid provision amounted to "status-based discrimination," because it "excluded religious schools … [based] solely on religious status." *Id.* at 2256. Eligibility for this government benefit required a school to "divorce itself from any religious control or affiliation," thereby deterring and punishing "'the free exercise of religion.'" *Id.* (quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2022 (2017)). The Court summed up its ruling as follows. "A State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious." *Id.* at 2261. It did not matter that the Montana Supreme Court had eliminated the program altogether; the faulty reasoning used by the state

supreme court meant that the total dissolution could not "be defended as a neutral policy decision." *Id.* at 2262.

The central lesson we distilled from *Espinoza* was that a state law that deprives a person of a benefit on the basis of religion is unconstitutional. With that in mind, we decided that "the issue has boiled down to one dispositive question of state law: what methodology for determining affiliation is required under the relevant Wisconsin statutes?" *St. Augustine II*, 2021 WL 2774246, at *2. Finding that the existing guidance from the Supreme Court of Wisconsin's decisions in *Vanko* and *Holy Trinity* did not resolve the point, we certified a question to that court, asking what materials a superintendent may use to determine religious affiliation. We also invited the court to re-formulate the question, if it deemed such a step to be appropriate. *Id.* at *3.

The Supreme Court of Wisconsin accepted our request for certification and responded in *St. Augustine III*. There it held that "[i]n conducting a neutral and secular inquiry," the Superintendent may examine the school's corporate documents and "may also consider the professions of the school with regard to the school's self-identification and affiliation, but the Superintendent may not conduct any investigation or surveillance with respect to the school's religious beliefs, practices, or teachings." 2021 WI 70 ¶ 5. A concurring justice suggested that the term "affiliated with" should be interpreted as involving "a mutual organizational relationship." *Id.* at ¶ 70–71 (Hagedorn, J., concurring). Shared faith would be relevant but insufficient, that justice indicated, to answer the question of affiliation, while "corporate documents, by-laws, and other types of organizational documents" would be more helpful. *Id.*

With the benefit of this guidance from the state supreme court, we reversed the 2017 judgment of the district court in December 2021. See *St. Augustine IV*, 21 F.4th at 449. We decided that the Superintendent's decision "was not justified by neutral and secular considerations, but instead necessarily and exclusively rested on a doctrinal determination that both St. Augustine and St. Gabriel's were part of a single sponsoring group—the Roman Catholic Church—because their religious beliefs, practices, or teachings were similar enough." *Id.* That is, the state had mistakenly assumed that shared faith *was* enough to establish affiliation. We explained that it was unnecessary "to reach any constitutional issue in this case"; rather, "it [was] enough to decide whether the Superintendent properly applied Wisconsin law … ." *Id.* at 451. Since the Superintendent's denial of St. Augustine's transportation benefits violated state law, and state law as properly construed entitled the Forros to the transportation benefits they had been seeking all along, we remanded to the district court to craft a remedial order. *Id.* at 453.

The effect of our remand to the district court was to revive all of the Forros' theories, including those based on state law. That is because a relinquishment of supplemental jurisdiction is a reviewable decision. Just as importantly, supplemental jurisdiction does not self-destruct if the federal theories on which it depended are resolved or dismissed. Indeed, it is common for a court of appeals, in the course of reviving federal theories, to instruct a district court to reconsider a decision to relinquish jurisdiction over state-law theories. "[W]here all the claims relate to the same set of operative facts, we will ordinarily reinstate the state-law [theory] along with the reinstated federal [theory]." *Edwards v. Snyder*, 478 F.3d 827, 832 (7th Cir. 2007). This is true even if parties have

begun litigating an issue in state court during the appeal. See, *e.g.*, *Bryan v. BellSouth Communications, Inc.*, 492 F.3d 231, 235 (4th Cir. 2007).

Here, unfortunately, the Forros have either overlooked or disregarded this aspect of supplemental jurisdiction. After *St. Augustine IV* (in which, we reiterate, the Forros *prevailed* on their claim for transportation benefits), they filed a petition for rehearing and/or for clarification. They contended that the state-law theories had vanished from the case because of the district court's decision many years earlier to relinquish supplemental jurisdiction. They then reasoned that because there was no state-law theory validly before us in *St. Augustine IV*, there was also no such theory before the district court on remand. What they wanted, plainly, was an opinion discussing the merits of their federal-law theories, however superfluous that might have been in light of their victory through the state-law route. The Forros presented this argument in a petition for rehearing, which we denied, and in a petition for writ of *certiorari*, which the Supreme Court denied. *St. Augustine School v. Underly*, 142 S. Ct. 2804 (2022) (mem.).

Back before the district court on cross-motions for summary judgment, the Forros ignored state law. Instead, they urged that there were no state-law theories before the district court and insisted that the only path to relief was a ruling on the federal-law theories. Exclusively as a matter of federal law, they asked for a declaratory judgment, a permanent injunction, and $9,000 in damages ($1,500 in transportation benefits per year, for six years, from 2015 to 2021).

The Superintendent and the school district, for their part, agreed with the Forros that there was no state-law theory properly before the district court and thus that no relief could

be awarded on that basis. They argued in addition that because *St. Augustine IV* said there was no need to reach the federal constitutional issues in the case, the law of the case doctrine forbade the district court from relying on those theories. In short, the Superintendent and the district contended that the Forros' own strategic decisions (*i.e.* their failure to oppose the district court's remand of the state-law theories or to pursue those actions in state court) had boxed them out of receiving any remedy. The Superintendent also renewed a motion to dismiss herself from the lawsuit on the ground that she is immune from suits for damages and is not engaged in an ongoing violation of federal law.

The district court shared the parties' consternation about what exactly was before it. But it decided to interpret *St. Augustine IV* as "implicitly reinstat[ing] the plaintiffs' state-law [theory]." Because the Forros made no argument for relief under state law, the district court concluded that they had "waived any entitlement to damages or injunctive relief under state law." The district court further noted that damages and injunctive relief "appear to be unavailable in an action for common law *certiorari* under Wisconsin law." Neither the district court nor the parties considered what relief might be available in an action under the Forros' other state-law theories, in particular the Uniform Declaratory Judgments Act. But, noting that "the Seventh Circuit has already found that the defendants violated state law by refusing to approve St. Augustine's attendance area," the district court issued a declaratory judgment reflecting that ruling. At that point, St. Augustine filed a motion for $166,000 in attorneys' fees.

As to the federal-law theories, the district court felt that it "must abide by [the Seventh Circuit's] express determination

that a decision on the constitutional claims is unnecessary," but it "express[ed] [its] view on how the constitutional claims would turn out" as an alternative ruling, should there be another appeal. As it had concluded in 2017, the court found no violation of either Religion Clause. That resolved the case except for St. Augustine's fee petition, which the court held in abeyance pending the outcome of this appeal.

Having recounted that messy procedural history, we can at last turn to the merits of the parties' arguments on appeal and cross-appeal. The Forros have appealed from the court's denial of an injunction and damages, as well as its refusal to rule on their federal-law theories. The Superintendent has cross-appealed, arguing that the declaratory judgment should be reversed because there was no state-law theory to support it and that the law of the case prevents adjudication of the federal questions. The school district joins the Superintendent's brief and adds a few arguments about how we should calculate damages if we decide that a monetary award is appropriate.

## II

Because this is an appeal and cross-appeal from a summary judgment decision, our consideration of the issues is *de novo*. *Johnson v. Edward Orton, Jr. Ceramic Found.*, 71 F.4th 601, 609 (7th Cir. 2023). On cross-motions, "we construe all facts and inferences therefrom in favor of the party against whom the motion under consideration is made." *Markel Ins. Co. v. Rau*, 954 F.3d 1012, 1016 (7th Cir. 2020) (quoting *In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006)).

A

We begin with the issues raised by the Forros, who are at-tacking the district court's decision to refrain from reaching the federal constitutional issues in this case. They take the po-sition that the district court had an obligation to address all the theories they presented in support of their clam, even if one disposes of the claim in their favor. That is incorrect.

After the Supreme Court of Wisconsin issued *St. Augustine III*, the Forros filed their statement in accordance with Circuit Rule 52(b), taking the position that the now-clear violation of state law could not and did not resolve their case. See 7th Cir. R. 52(b) (requiring parties to state "their positions about what action this court should take" following a state court's deci-sion on a certified question). They doubled down on this stance in their petition for rehearing after *St. Augustine IV*. That petition urged that "there *must* be resolution of St. Au-gustine's constitutional claims." (emphasis in original). They reiterate that position now. They assert that the district court had a duty to reach the federal constitutional questions be-cause nothing else was left in the case after the court re-manded all the state-law theories in 2017.

There are a number of flaws in the plaintiffs' position. First, it fails to recognize the U.S. Supreme Court's preference for constitutional avoidance, if a difficult question can be re-solved either by reliance on state law, see *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 501 (1941), or on statutory grounds, see *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001). "Prior to reaching any constitutional questions, federal courts must consider nonconstitutional grounds for decision." *Jean v. Nelson*, 472 U.S. 846, 854 (1985) (quoting *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99 (1981)).

"Constitutional adjudication" must be "unavoidable." *Specter Motor Serv. v. McLaughlin*, 323 U.S. 101, 105 (1944).

Second, as we already have noted, the Forros are mistaken about the waxing and waning of a court's supplemental jurisdiction. When jurisdiction over state-law theories has been relinquished but the federal basis of the suit is reinstated on appeal, those theories do not disappear. To the contrary, they can be and often are revived in federal court.

The latter is what happened in this case. After the state supreme court spoke, it became apparent that the Forros' claim could be resolved on state-law grounds. See *St Augustine IV*, 21 F.4th at 452. Those theories were always part of the case, but they ceased being novel or complex after the state court addressed them. That eliminated the reason for relinquishing jurisdiction over them.

The Forros contend that we must reach the federal constitutional issues because there is no sustainable state theory here, but that is plainly not the case. The action of the state supreme court is dispositive, and we already have concluded that the Forros are entitled to their transportation benefits as a matter of state statutory law. Beyond that, they have no right to demand that the court's decision be based on one theory versus another. They complain that state law does not provide the same remedies as federal law would, but that too is incorrect. Wisconsin's Uniform Declaratory Judgment Act grants courts the authority to issue relief supplemental to a declaratory judgment "whenever necessary or proper." Wis. Stat. § 806.04. The Supreme Court of Wisconsin has confirmed that both injunctive relief and damages are proper forms of supplemental relief. See *Town of Blooming Grove v. City of Madison*, 275 Wis. 328, 336 (1957) ("Injunctive relief may be

granted in aid of a declaratory judgment, where necessary or proper to make the judgment effective."); *F. Rosenberg Elevator Co. v. Goll*, 18 Wis. 2d 355, 363 (1963) ("[W]here the court has entered a decree adjudicating the rights of parties and where the granting of relief in the form of damages may be predicated on that determination of rights, the court making the determination should also make that award of damages."). This covers the full range of remedies, and so we have no need to consider what would happen if the state offered less than that.

The Forros also contend that we must reach the constitutional questions because abstention operates differently for cases brought under section 1983. They rely on language from *Monroe v. Pape*, where the Supreme Court rejected the idea that litigants must exhaust state remedies before suing under section 1983. 365 U.S. 167, 183 (1961) ("It is no answer that the State has a law which if enforced would give relief. The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked."). The Court reiterated this point in *Zinermon v. Burch*, explaining that "overlapping state remedies are generally irrelevant to the question of the existence of a cause of action under § 1983." 494 U.S. 113, 124 (1990).

But this language has nothing to do with the sequence in which a court reaches alternative theories for relief, nor does it address abstention. See *Askew v. Hargrave*, 401 U.S. 476, 478 (1971) (*per curiam*) (abstaining from deciding a section 1983 theory because the "state law [causes of action] … , if sustained, will obviate the necessity of determining the Fourteenth Amendment question"); Martha A. Field, *Abstention in Constitutional Cases, The Scope of the* Pullman *Abstention*

*Doctrine*, 122 U. Penn. L. Rev. 1071, 1131–33, 1133 n.165 (1974) (finding no support for a civil rights exception to abstention). In cases like this one, where the non-constitutional theories are sufficient to provide a plaintiff with all the relief she seeks, the Supreme Court has instructed lower courts to avoid constitutional adjudication. See *Jean*, 472 U.S. at 854–55 (holding that the governing statute provided adequate relief to petitioners and made it unnecessary to address the constitutional issue); see also *Hsu ex rel. Hsu v. Roslyn Union Free School Dist. No. 3*, 85 F.3d 839, 854, 862 (2d Cir. 1996) (noting the practice of avoiding constitutional questions and resolving the case in the plaintiffs' favor based only on their argument under the Equal Access Act while avoiding theories for violations of the Free Exercise Clause, Free Speech Clause, and Free Association Clause). This was precisely what we did in *St. Augustine IV*. After determining that we could not complete the *Espinoza* analysis without a proper understanding of the applicable state law, we sought guidance from the state supreme court on that issue. Unlike the application of Montana law in *Espinoza*, which was incompatible with the Religion Clauses, the Wisconsin statute governing transportation benefits did not disadvantage the St. Augustine (or St. Gabriel) students. All were entitled to the benefits in question. This was enough to resolve the concrete dispute before the court, and so it was unnecessary to reach the constitutional issues. See *St. Augustine IV*, 21 F.4th at 451–52.

The remaining question is what to do in light of the fact that the Forros unambiguously waived their right to relief under their state-law theories. If by so doing they hoped to force us to reach the federal theories, they were mistaken. We will not allow ourselves to be manipulated into constitutional adjudication in this manner; parties do not have the right to

compel a court to write what would essentially be an advisory opinion on a theory that it did not need to reach. *St. Augustine IV* provided plaintiffs with a clear path to recovery that they chose to forego. Litigants are held to their choices, even when the consequences are harsh. We accordingly see no error in the district court's decision to treat their requests for damages and injunctive relief under state law as waived and to issue only a declaratory judgment based on the findings of *St. Augustine IV*.

B

All that is left to resolve is defendants' cross-appeal, their renewed motion to dismiss, and a few additional arguments on the proper scope of the remedy. Looking first at the Superintendent's cross-appeal, we conclude that there is no reason to disturb the district court's declaratory judgment. For reasons already stated, *St. Augustine IV* reinstated the state-law theories. The district court thus had supplemental jurisdiction over them, and on that basis was empowered to issue its declaratory judgment. The Superintendent's arguments that such reinstatement is improper disregard the law governing remands. Nor did action taken by the Forros have the effect of destroying the district court's jurisdiction.

Next, we examine the Superintendent's motion to dismiss. This was properly denied. The Superintendent attempts to invoke sovereign immunity, but her sovereign immunity defense was waived when she voluntarily joined in the removal to federal court. See *Lapides v. Board of Regents*, 535 U.S. 613, 624 (2002) (holding that a state that joins in the removal of state-law claims to federal court waives its Eleventh Amendment immunity on those causes of action). There is no need to worry about possible damages or injunctive relief, because

the district court ruled in the Superintendent's favor on those points and we are not disturbing that part of its judgment. For the same reason, we need not contend with the school district's arguments about any limitations on the Forros' entitlement to compensatory payments.

### III

We AFFIRM the judgment of the district court. Its declaratory judgment remains in effect against the Superintendent and Friess Lake, now Holy Hill Area School District. The case is REMANDED so that the district court may decide what attorneys' fees St. Augustine and the Forros should be awarded, if any, given the fact that they have prevailed only to the extent of obtaining declaratory relief under state law. The district court should determine their entitlement to costs in accordance with 28 U.S.C. § 1920.

RIPPLE, *Circuit Judge*, dissenting. As this case has traveled its circuitous path, a regrettable analytical fog has progressively obscured the good faith and thoughtful attempts of all actors, judges and lawyers, to resolve this case. Today, in my view, despite its best efforts, the majority, impeded by this fog, further obscures the matter by drawing the wrong conclusions from this muddied procedural history and, in the process, by departing from the mandate of the Supreme Court of the United States dated July 2, 2020. I respectfully dissent.

From the beginning of this litigation, the plaintiffs' federal constitutional claims have been at the center of this case. The district court issued a decision and order that has been the basis of the subsequent appellate proceedings. That decision and order did two things. First, it determined that the plaintiffs' state-law claims presented a "novel issue of state law, in that the existing Wisconsin cases d[id] not clearly answer the question" at issue, and for that reason it decided to relinquish supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367(c)(1).[1] Second, the court granted summary judgment for the defendants on the federal constitutional claims brought under 42 U.S.C. § 1983.[2]

From that point on, the case has been litigated on federal constitutional grounds. Indeed, on review of the district court's decision, in *St. Augustine School v. Evers*, 906 F.3d 591, 596 (7th Cir. 2018) (*St. Augustine I*), we stated that "the

---

[1] R.41 at 9.

[2] *Id.* at 17–24. Despite the majority's suggestion to the contrary, *see* Majority Op. 8, the district court's relinquishment of the state claims was not in any way premised upon the absence of a remaining federal question in the case.

constitutional claims" were "the heart of this case," and a divided panel held that the defendants' denial of transportation benefits to the plaintiffs did not violate either of the Religion Clauses of the federal Constitution. The majority today says that, in *St. Augustine I*, "we considered all aspects of the district court's final judgment, including the parts of the judgment that remanded the state-law theories to state court." Majority Op. 9. Although, as a technical matter, our appellate review can extend to the entirety of an "appealable order," Fed. R. App. P. 3(c)(4), it overstates the situation to say that we considered the state-law claims in *St. Augustine I*. We made note of those claims once in recounting the procedural posture of the case and paid no further attention to them; nor have they been the focus of any subsequent litigation in the case.

After the plaintiffs lost their appeal before us, they petitioned for a writ of certiorari from the Supreme Court of the United States. The Court granted the petition, vacated our judgment in *St. Augustine I*, and remanded the case to us for reconsideration in light of its intervening decision in *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020). From then on, the Supreme Court's mandate has defined the limits of our authority in this case. *Sibbald v. United States*, 37 U.S. 488, 492 (1838) ("When the Supreme Court have executed their power in a cause before them, and their final decree or judgment requires some further act to be done, … [t]he inferior court is bound by the decree as the law of the case; and must carry it into effect, according to the mandate.").

As the majority observes, "[o]n remand, as instructed, we took a careful look at *Espinoza* to see how it affected this litigation." Majority Op. 10. We "distilled from *Espinoza*" the

lesson "that a state law that deprives a person of a benefit on
the basis of religion is unconstitutional." *Id.* at 11. To apply
that lesson in full to this case, we determined that we needed
to understand better how Wisconsin Statute § 121.51(1) oper-
ated—specifically, "what methodology for determining affil-
iation is required" under that statute? *St. Augustine School v.
Taylor*, No. 17-2333, 2021 WL 2774246, at *2 (7th Cir. Feb. 16,
2021) (*St. Augustine II*). Accordingly, we certified to the Wis-
consin Supreme Court the question of how exactly § 121.51(1)
should be interpreted. *See id.* at *3. That action was, in my
view, an appropriate measure to take in the course of fulfilling
the mandate of the Supreme Court. Our certification order im-
plied, without stating outright, that we understood the de-
fendants' actions in this case to be unconstitutional under *Es-
pinoza*. But, in posing the question to the Wisconsin Supreme
Court, we recognized that *Espinoza* opened up a broader issue
that we needed to address: Was the Wisconsin statute itself
unconstitutional, or had the defendants acted in defiance of
both state law and the federal Constitution? If, in *St. Augustine
I*, we had properly understood state law as permitting the in-
quiry that the superintendent had in fact made, "then we [had
to] consider first whether *Espinoza* renders that state law in-
valid under the First Amendment's Religion Clauses." *Id.* at
*2. If, on the other hand, we had misunderstood state law and,
contrary to our earlier understanding, the superintendent had
acted improperly under § 121.51(1), then the state law would
not offend the Religion Clauses.

The Wisconsin Supreme Court's answer (*St. Augustine III*)
gave us the information needed to resolve that question. With
its guidance in hand, we resumed proceedings and issued our
decision in *St. Augustine School v. Underly*, 21 F.4th 446 (7th
Cir. 2021) (*St. Augustine IV*). There, we stated that "all that

remains is for us to apply the instructions of the state supreme court to the facts of this case." *Id.* at 448. In a regrettably ambiguous opinion that has confounded almost everyone involved in the case, we seemingly held *both* that the defendants had violated the state statute and the federal Constitution, *id.* at 448–49,[3] *and*, simultaneously, that it was not "necessary to reach any constitutional issues in this case" and that, instead, it was "enough to decide whether the [defendants] properly applied Wisconsin law" to the plaintiffs, *id.* at 451. In other words, our decision seemed to say at once that the defendants violated the Constitution and that we refrained from deciding whether they violated the Constitution.

The majority concludes that it was at this moment that the plaintiffs' state-law claims were revived *sub silentio* and that it became incumbent upon them to pursue these claims on remand in the district court if they wished to obtain relief. Majority Op. 12–13. The majority is mistaken on this point.[4] I

---

[3] "[A]s a matter of state law [the superintendent] may not delve into 'the school's religious beliefs, practices, or teachings,' because [that] inquiry would transgress the First Amendment prohibition against excessive entanglement with religious matters. We conclude that [the defendants'] decision in the case before us was not justified by neutral and secular considerations, but necessarily and exclusively rested on a doctrinal determination that both St. Augustine and St. Gabriel's were part of a single sponsoring group … because their religious beliefs, practices, or teachings were similar enough." *St. Augustine IV*, 21 F.4th at 448–49 (citation omitted).

[4] It is doubtful that the plaintiffs' state-law claims were automatically revived with our decision in *St. Augustine IV*. The majority says that relinquishment is "a reviewable decision" and that "it is common for a court of appeals, in the course of reviving federal theories, to instruct a district court to reconsider a decision to relinquish jurisdiction over state-law theories." Majority Op. 12. This is true enough, but the majority fails to note,

dissent primarily, however, because of a more fundamental mistake in our decision in *St. Augustine IV*, a mistake that has set the stage for the present state of confusion and the majority's ultimate disposition of this appeal.[5]

---

first, that we nowhere *reviewed* in any express or implied terms the district court's relinquishment decision and, second, that the familiar pattern of reinstatement unfolds in cases where the district court relinquished jurisdiction pursuant to § 1367(c)(3), not § 1367(c)(1). Put aside the distinction between subparagraphs (c)(3) and (c)(1), however, and notice that, even under the majority's standard, we never affirmatively *instructed* the district court to reconsider its § 1367(c)(1) order. *Compare Edwards v. Snyder*, 478 F.3d 827, 832 (7th Cir. 2007) ("[W]here all the claims relate to the same set of operative facts, we will *ordinarily reinstate* the state-law claim along with the reinstated federal claim." (emphasis added)); *Armstrong v. Squadrito*, 152 F.3d 564, 582 (7th Cir. 1998) ("[B]ecause this decision reinstates Armstrong's federal claims, on remand the district court should entertain supplemental jurisdiction over Armstrong's state law claims."); *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 79 (2d Cir. 2003) (expressly reinstating state-law claims). The majority cites no authority for the proposition that state-law claims relinquished pursuant to § 1367(c)(3) are *automatically* reinstated upon reinstatement of the federal claims—much less that this occurs after a § 1367(c)(1) relinquishment. The notion that these claims were reinstated *sub silentio*, and that the plaintiffs overlooked this procedural nicety at their peril, raises serious questions about notice and stands in tension with the basic purposes of our rules of procedure—"to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

[5] The Supreme Court denied the plaintiffs' petition for writ of certiorari after *St. Augustine IV*. However, the rule is well-established that, given the intensely "discretionary nature of certiorari," the "denial of certiorari does not indicate any view on the merits." 16B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4004.1 (3d ed. 2012). Indeed, denial of certiorari does not have "any precedential effect," *Hopfmann v. Connolly*, 471 U.S. 459, 460–61 (1985), and the Court's mandate therefore remained unchanged.

With all respect to my colleagues, it is clear to me, in retrospect, that we erred in *St. Augustine IV* when we did not clearly and unambiguously rule on the constitutionality of the defendants' actions. We were incorrect to say that "all that remain[ed]" was to apply the Wisconsin Supreme Court's guidance. To the contrary, we remained subject to the Supreme Court's mandate to reconsider our judgment in *St. Augustine I* in light of *Espinoza*; this obligation called for constitutional adjudication of the plaintiffs' First Amendment claims, the claims we had adjudicated in *St. Augustine I*. The Court's mandate thus invited us to decide whether those claims had merit in light of *Espinoza*; acceptable responses to that mandate would have been "we affirm the district court's grant of summary judgment on the plaintiffs' federal-law claims" or "we reverse the district court's grant of summary judgment on the plaintiffs' federal-law claims." Reversing the district court's judgment on separate grounds was not an option that was available to us.

To be sure, our certification of a question of state law to the Wisconsin Supreme Court was, when made, consistent with the mandate: The issues before us called into question the constitutional soundness not just of the defendants' particular actions but also of the state statute under which they claimed authority to act. Today's decision assigns another purpose to the certification: Certification now becomes a device by which the Supreme Court's mandate is avoided and, in the process, less than full relief is afforded to the plaintiffs. The Supreme Court has "consistently held that an inferior court has no power or authority to deviate from the mandate issued by an appellate court." *Briggs v. Pennsylvania R. Co.*, 334 U.S. 304, 306 (1948). Having received the Court's mandate, we "cannot vary it, … or give any other or further relief; … or

intermeddle with it, further than to settle so much as has been remanded." *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255 (1895). It "violate[s] the mandate … to fail to decide questions" that we have been "directed … to decide." 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4478.3 (3d ed. 2019).

We are obligated to adjudicate the plaintiffs' federal constitutional claims. Implicitly, we already have taken a view on them in *St. Augustine II* and *St. Augustine IV*. But, because we have not clearly announced that, in light of *Espinoza*, the defendants' actions violated the Religion Clauses of the Constitution, I would vacate our decision in *St. Augustine IV*, analyze and adjudicate the question of federal constitutional law, and remand the case to the district court to craft a remedy.

As the foregoing discussion makes clear, the majority's concern with the principle of constitutional avoidance has no bearing here. Because the Supreme Court directed us to adjudicate the constitutional claims, we must do so.

I respectfully dissent.